**Slip Op. 99-110**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

_____

| | |
|---|---|
| Heartland By-Products, Inc., | **:** |
| Plaintiff, | **:** |
| | **:** **Court No. 99-09-00590** |
| v. | **:** **Before: Barzilay, Judge** |
| | **:** |
| United States of America, | **:** |
| Defendant, | **:** |
| and | **:** |
| United States Beet Sugar Association, | **:** |
| Defendant-Intervenor. | **:** |

_____**:**

[Plaintiff's Motion for Judgment Upon an Agency Record granted.]

Decided: October 19, 1999.

Mayer, Brown & Platt (Simeon M. Kriesberg, Kathryn Schaefer, Andrew A. Nicely), and Serko & Simon (David Serko, Daniel J. Gluck) for Plaintiff.

David W. Ogden, Acting Assistant Attorney General; Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office; Commercial Litigation Branch, Civil Division, Department of Justice (Aimee Lee); Karen P. Binder, Office of Assistant Chief Counsel, International Trade Litigation, Customs Service, (Yelena Slepak) and Allan Martin, Associate Chief Counsel, Customs Service, (Ellen Daly), of counsel, for Defendant.

Wilmer, Cutler & Pickering (Lewis J. Liman, Robert C. Cassidy, Jr.), for Defendant-Intervenor.

**OPINION**

**BARZILAY, JUDGE:**

### I. INTRODUCTION

This matter is before the court pursuant to Plaintiff's Motion for a Preliminary Injunction or in the alternative, for Judgment Upon an Agency Record pursuant to USCIT R. 56.1.[1] Plaintiff seeks pre-importation review of a ruling issued by the United States Customs Service ("Customs") revoking a prior classification ruling issued to Plaintiff. *See Revocation of Ruling Letter and Treatment Relating to Tariff Classification of Certain Sugar Syrups*, 33 Cust. Bull. No. 35/36 at 41 (Sept. 8, 1999) ("Final Notice"). The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(h) (1994).[2]

---

[1] On September 22, 1999, the Court heard oral argument on an Order to Show Cause why an expedited briefing schedule on Plaintiff's Motion for a Preliminary Injunction should not issue. Following negotiations, the parties agreed to deem Plaintiff's Motion for a Preliminary Injunction as one for Judgment Upon an Agency Record as well ("*Pl.'s Br.*"). Pursuant to the parties' agreement, on September 24, the court entered an extremely expedited briefing schedule which was designed to allow a final determination on the merits by October 15. On October 14, 1999, the Court heard oral argument on the merits and issued a ruling from the bench following the hearing. This opinion further explains the reasons for the decision.

[2] Plaintiff moved to strike the Declaration of David Williams, *Def.'s Mot. To Dismiss and Mem. in Supp. of the United States' Resp. in Opp'n to Pl.'s Mot. For J. on the Agency R., and/or in the Alternative, Mot. For Prelim. Inj., and in Support of the United States' Mot. To Dismiss the Action* at Attachment 1 ("*Def.'s Br.*"), and the Declaration of Jeffrey Robinson, *Def.-Intervenor's Mem. in Supp. of its Mot. To Dismiss and in Opp'n to Pl.'s Mot. For a Prelim. Inj and to Pl.'s Mot. For J. on the Agency R.* at Annex 24 ("*Def.-Intervenor's Br.*"), since they were not part of the agency record. To the extent the Court considers these submissions it does so narrowly and not as support or explanation for the agency's decision. Accordingly, Plaintiff's motion is denied. Plaintiff has also requested attorney's fees, expenses and court costs under the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994). The Court finds this request premature at the present time, *see* 28 U.S.C. § 2412(d)(1)(B), and thus does not address it.

## II. BACKGROUND

Plaintiff, a sugar refiner, imports sugar syrup from Canada and refines the syrup into liquid sucrose. The sugar syrup is derived from sugar cane and sugar beets and contains more than six percent soluble non-sugar solids. Before undertaking business operations, Plaintiff sought an advance ruling from Customs pursuant to the provisions of 19 C.F.R. § 177 (1995).[3] On May 15, 1995, Customs issued New York Ruling Letter ("NYRL") 810328 classifying the merchandise under

---

[3] The general provision, 19 C.F.R. 177.1, provides:

> It is in the interest of the sound administration of the Customs and related laws that persons engaging in any transaction affected by those laws fully understand the consequences of that transaction prior to its consummation. For this reason, the Customs Service will give full and careful consideration to written requests from importers and other interested parties for rulings or information setting forth, with respect to a specifically described transaction, a definitive interpretation of applicable law, or other appropriate information. Generally, a ruling may be requested under the provisions of this part only with respect to prospective transactions--that is, transactions which are not already pending before a Customs Service office by reason of arrival, entry, or otherwise.

*Id.* A ruling letter is defined as "a ruling issued in response to a written request therefor and set forth in a letter addressed to the person making the request or his designee." *Id.* at 177.1(d)(1).

The person requesting the ruling is to submit the request in the form of a letter. *See* 19 C.F.R. 177.2(a). Letters requesting classification must comport with the provisions of 19 C.F.R. 177.2(b)(2)(ii), which in relevant part state:

> If the transaction involves the importation of an article for which a ruling as to its proper classification under the provisions of the Harmonized Tariff Schedule of the United States is requested, the request for a ruling should include a full and complete description of the article and whenever germane to the proper classification of the article, information as to the article's chief use in the United States, its commercial, common, or technical designation, and, where the article is composed of two or more materials, the relative quantity (by weight and by volume) and value of each.

*Id.*

subheading 1702.90.40 of the Harmonized Tariff Schedule of the United States ("HTSUS") (1995)[4],

_____

 [4]  The provisions of the HTSUS at issue are as follows:

General Rules of Interpretation

Classification of goods in the tariff schedule shall be governed by the following principles:

1.    The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions[.]

****

6.    For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the above rules, on the understanding that only subheadings at the same level are comparable.  For the purposes of this rule, the relative section, chapter and subchapter notes also apply, unless the context otherwise requires.

Chapter 17

*Additional U.S. Notes*

****

5.    [T]he aggregate quantity of sugars, syrups and molasses entered, or withdrawn from warehouse for consumption . . . during any fiscal year, shall not exceed in the aggregate an amount (expressed in terms of raw value), not less that 22,000 metric tons, as shall be established by the Secretary [of Agriculture].

| *Heading/Subheading* | *Article Description* |
|---|---|
| 1702 | Other sugars, including chemically pure lactose, maltose, glucose and fructose, in solid form; sugar syrups not containing added flavoring or coloring matter; artificial honey, whether or not mixed with natural honey; caramel: |
| | **** |
| 1702.90 | Other, including invert sugar: |
| | Derived from sugar cane or sugar beets: |
| | Containing soluble non-sugar solids (excluding any foreign substances that may have been added or developed in the product) equal to 6 percent or less by weight of the total soluble solids: |
| | **** |
| 1702.90.10 | Described in additional U.S. note 5 to this |

with a .7 cents per liter general rate of duty and a .2 cents per liter special rate of duty if the goods

qualify as North American Free Trade Agreement ("NAFTA") originating goods. Administrative

Record File I, Doc. 3 ("AR I(3)").

Plaintiff began its refining operations in the middle of 1997. The process Plaintiff uses to

refine the sugar syrup into liquid sucrose, while proprietary, may be described in general terms.

Before arriving in the United States, the sugar syrup is manufactured according to Heartland's

specifications. The process involves adding raw granular sugar, dry form sucrose, to molasses.

Water is added and the material is then heated and agitated dissolving the dry form sucrose and

forming a definable, homogeneous sugar syrup. *See* AR I(26) at 3. After being transported to the

plant in Taylor, Michigan, the syrup is pumped into storage tanks and the following steps occur.

First, the syrup is placed in a vacuum pan to induce the crystallization of sucrose. Next, the

massecuite, a slurry of crystals and syrup, is subjected to centrifugal force to separate the crystals

---

|           |   | chapter and entered pursuant to its provisions |
|-----------|---|---|
| 1702.90.20 |   | Other[1] |
|           | **** | |
| 1702.90.40 |   | Other |
|           | **** | |

[1] See subheadings 9904.17.08-9904.17.16.

|           | **** | |
|-----------|---|---|
| 9904.17.08 |   | Sugars, syrups and molasses, provided for in subheadin[g] 1702.90.20: |
|           |   | If entered during the effective period of safeguards based upon value: |
|           |   | **** |
| 9904.17.16 |   | If entered during the effective period of safeguards based upon quantity announced by the Secretary of Agriculture |

from the syrup. Finally the crystals are subjected to a number of steps making them suitable to sell

as liquid sucrose for use in the production of cereal, ice cream, candy and other food applications.

The sucrose content of the liquid sucrose is several percentage points higher than the syrup in its

condition as imported. Some of the residue, which is molasses, is sold for use in animal feed, some

is lost in the process and some is returned to Canada.

On January 14, 1998, Defendant-Intervenor, United States Beet Sugar Association, filed a

petition with Customs under 19 U.S.C. § 1516, suggesting alternatively that Customs had the option

to proceed under 19 U.S.C. § 1625, seeking reclassification of the sugar syrup.[5] AR I(1). Customs

chose the latter option, and on June 9, 1999, issued notice of its intent to revoke NYRL 810328 and

invited comments pursuant to 19 U.S.C. § 1625(c)(1) on proposed Headquarter Ruling ("HQ")

961273. *See Proposed Revocation of Ruling Letter and Treatment Relating to Tariff Classification

of Certain Sugar Syrups*, 33 Cust. Bull. No. 22/23 at 52 ("Preliminary Notice"). Because of this

procedural mechanism, Plaintiff was forced to obtain Defendant-Intervenor's submission through

a Freedom of Information Act request. Following an extension of the comment period to August 9,

1999, on September 8, 1999, Customs published a notice of revocation, which pursuant to 19

---

[5] Section 1516 provides that an interested party may inquire into, among other things, the classification of imported merchandise and file a petition setting forth the rate of duty it believes proper. *See* 19 U.S.C. § 1516(a). If the Secretary of the Treasury determines the classification is incorrect, the statute directs him to determine the correct classification. *See id.* at § 1516(b). If the Secretary determines the classification is correct he is directed to notify the petitioner who then has thirty days to contest the decision. *See id.* at § 1516(c). Upon receipt of such notice, the Secretary must publish his determination and the petitioner's desire to contest it, and furnish the petitioner with sufficient information to enable a challenge to the liquidation of one entry. *See id.* No time limits are imposed on the Secretary to make his initial decision.

Section 1625 provides at least a thirty day comment period for modification or revocation of a prior interpretive ruling or decision in effect for at least sixty days. *See* 19 U.S.C. § 1625(c)(1). Once the comment period closes, the Secretary is directed to publish a final ruling within thirty days. *See id.* Sixty days following publication of the final ruling or decision it becomes effective. *See id.*

U.S.C. § 1625 makes HQ 961273 effective on November 8, 1999, sixty days following publication. *See* Final Notice at 41. Plaintiff then sought relief in this court as previously described.[6]

### III. STANDARD OF REVIEW

28 U.S.C. § 2640(e) (1994) provides that "[i]n any civil action not specified in this section, the [court] shall review the matter as provided in [5 U.S.C. § 706]." (28 U.S.C. § 1581(h) is not specified therein). *Id.* 5 U.S.C. § 706(2)(A) provides, in relevant part, that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions of law found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* The scope of review is limited to the administrative record. *See* 28 U.S.C. § 2640(e); 5 U.S.C. § 706.

### IV. DISCUSSION

A.    *Plaintiff Has Met Its Burden of Demonstrating by Clear and Convincing Evidence That the Court Has Jurisdiction Pursuant to 28 U.S.C. § 1581(h).*

Plaintiff asserts that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §1581 (h) with respect to declaratory relief and §1581 (i) with respect to injunctive relief. Defendant concedes jurisdiction with respect to § 1581(h) but challenges jurisdiction under §1581(i). Defendant-Intervenor contests jurisdiction under both §1581(h) and (i), and argues that the Court may only exercise jurisdiction pursuant to §1581(a). Because of the differing positions of each party

---

[6] In its complaint, Plaintiff included a count alleging that Customs abused its discretion by permitting political considerations to dictate the reclassification. As emphasized at oral argument held October 14, 1999, the Court views this case as one dealing solely with the proper classification of Plaintiff's imported product. Therefore, none of the allegations, on both sides, of improper political activity entered into the Court's deliberations or decision. In addition, because the Court holds for Plaintiff on the classification issue, it need not, and does not, consider two of Plaintiff's other claims: Count III, that Customs violated the law by proceeding under 19 U.S.C. § 1625 rather than under 19 U.S.C. § 1516; Count V, that Customs violated the law by failing to demonstrate a compelling reason for its revocation.

in this case, the Court finds it necessary to address the issue of jurisdiction in detail. The Court exercises jurisdiction under §1581(h), and will grant relief accordingly, thus the need for a preliminary injunction is moot.

Section 1581(h), Title 28, United States Code, provides:

The [court] shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, . . . or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.

28 U.S.C. § 1581(h) (1994). The Court of Appeals for the Federal Circuit outlined four requirements for invoking the jurisdiction of this Court under 28 U.S.C. § 1581(h):

(1) judicial review must be sought prior to importation of goods;
(2) review must be sought of a ruling, a refusal to issue a ruling or a refusal to change such ruling;
(3) the ruling must relate to certain subject matter; and
(4) irreparable harm must be shown unless judicial review is obtained prior to importation.

*American Air Parcel Forwarding Co. v. United States*, 718 F.2d 1546, 1551-52 (Fed. Cir. 1983), *cert. denied*, 466 U.S. 937 (1984).

Defendant does not claim that the Court lacks jurisdiction under § 1581(h). Between the other parties to this action, there is no dispute as to the first three requirements of jurisdiction under this section. Defendant-Intervenor challenges only Heartland's claim of irreparable injury. "When a jurisdictional issue is raised, the burden rests on the plaintiff to prove that jurisdiction exists." *Manufacture de Machines du Haut-Rhin v. von Rabb*, 6 CIT 60, 62, 569 F. Supp. 877, 880 (1983) (citing *United States v. Biehl & Co.*, 3 CIT 158, 160, 539 F. Supp. 1218, 1220 (1982)). Plaintiff must

demonstrate irreparable harm by a clear and convincing evidence standard.[7]

Irreparable harm is that which "cannot receive reasonable redress in a court of law." *Manufacture de Machines du Haut Rhin*, 6 CIT at 64, 569 F. Supp. at 881-82 (quoting BLACK'S LAW DICTIONARY 706-707 (5th ed. 1979)). "In making this determination, what is critical is not the magnitude of the injury, but rather its immediacy and the inadequacy of future corrective relief." *National Juice Products v. United States*, 10 CIT 48, 53, 628 F. Supp. 978, 984 (1986) (citations omitted). To fulfill its burden, Plaintiff must "set forth sufficient documentation to support its allegations in establishing the threat of irreparable harm." *Thyssen Steel Co., Southwestern Division of Thyssen, Inc. v. United States*, 13 CIT 323, 326, 712 F. Supp. 202, 204 (1989) (citing *718 Fifth Avenue Corp. v. United States*, 7 CIT 195, 198 (1984)).

Plaintiff asserts that implementation of the revocation of NYRL 810328 will destroy its business. *Compl.* ¶ 9 (citing Affidavit of Gregory Kozak ("Kozak Aff.")). Plaintiff claims that the reclassification of Heartland's sugar syrup as per HQ 961273 will subject the sugar syrup to a prohibitive tariff-rate quota ("TRQ"), thereby preventing Heartland from importing the product and effectively forcing it to close its doors. *Id.*

Plaintiff has provided sufficient documentation to clearly and convincingly establish jurisdiction under §1581(h). Attached to its brief is the affidavit of the President of Heartland, Gregory Kozak, detailing the extent of business disruption that Heartland will suffer if it is unsuccessful in its legal challenge. The proposed increase in duties of 7000 percent, which will result from the revocation of NYRL 810328, will raise Heartland's costs, and force Heartland's three

---

[7]28 U.S.C. § 2639(b) provides: "In any civil action described in section 1581 (h) of this title, the person commencing the action shall have the burden of making the demonstration required by such section by clear and convincing evidence."

main customers to arrange long-term commitments with other suppliers. Kozak Aff. ¶ 13-16.[8]

Heartland will additionally have to abandon its transport and supply arrangements. *Id.* ¶ 20. The

company will thereby be forced to lay off all of its sixty employees trained to work in the Taylor,

Michigan plant, and completely cease production. *Id.* ¶ 17, 21-23.

The fatal blow that reclassification will deal to Heartland certainly suffices as "irreparable

injury." Not only will failure to obtain review prior to importation sound the death knell for

Heartland's business, but the injury will, as evidenced by the aforementioned documentation, occur

immediately. Future corrective relief will be inadequate, as even if Heartland prevails on the

classification ruling, its main customers will have made long-term supply arrangements with other

sugar producers.

Precedent indicates that irreparable harm may be sufficiently shown in instances where the

harm is less drastic than a total shutdown. As this court in *National Juice* stated, "severe disruption

of business operations can constitute irreparable injury under certain circumstances." 10 CIT at 54,

628 F. Supp. at 984. In *National Juice*, this court held that the plaintiffs had demonstrated

irreparable harm by showing that they would be "unable to use foreign manufacturing concentrate

and . . . [unable] to satisfy all of their customer's [sic] orders for retail orange juice products." *Id.*

Additionally, in *American Frozen Food Institute, Inc. v. United States*, this court held irreparable

injury to be established when "[p]laintiffs have presented evidence that they will lose substantial

sums of money from the destruction of stockpiled non-complying labelling." 18 CIT 565, 570, 855

F. Supp. 388, 393 (1994). Neither of the plaintiffs in either case established evidence of total

---

[8]Heartland has supplied the Court with documentation of the loss of its customers in the form of letters from its customers indicating their plans to take their business elsewhere if the original classification is not restored. *See Pl.'s Br.* at Confidential Annex 6-8.

business destruction and yet this court held irreparable injury to be sufficiently established. As Plaintiff in this case has shown documented evidence that its doors will be forced to close barring revocation of the reclassification, the Court holds that Plaintiff has more than met its burden of providing evidence of irreparable harm, and therefore jurisdiction under § 1581(h) is proper.

Defendant-Intervenor argues that Heartland has not "made such a 'clear showing' that its case falls within the 'limited circumstances' of Section 1581(h)." *Def.-Intervenor's Br.* at 11 (citations omitted). It asserts that because Heartland "does not claim that it would be placed in bankruptcy or that it would suffer irreparable reputational harm . . . [its] claims of irreparable harm are hollow at best and misleading at worst." *Id.* at 12-13. Yet Plaintiff "may, but need not, demonstrate that it would suffer multiple forms of irreparable harm." *CPC International, Inc. v. United States*, 19 CIT 978, 980, 896 F. Supp. 1240, 1243 (1995). Defendant-Intervenor may therefore not successfully disprove this court's jurisdiction under §1581(h) merely by reciting other forms of irreparable harm which Plaintiff has *not* stated in support of its claim.

Defendant-Intervenor's only challenge to the reason Plaintiff has given the Court as a basis for jurisdiction is the mere assertion that its parent corporation, E.D. & F. Man Group can absorb the increased costs that Heartland will suffer if the sugar syrup is not reclassified. *Id.* at 12-13. This argument is meritless for several reasons. First, Heartland's parent company is not a party to this case, and Defendant-Intervenor cannot successfully challenge a party's showing of irreparable harm by making assertions based on the potential financial abilities of a nonparty. The Court agrees with Plaintiff that asking the Court to hold a nonparty parent company responsible for the losses of a subsidiary party to the case is essentially asking the Court to pierce the corporate veil. *Pl.'s Reply Mem. of Points and Authorities in Supp. of Pl.'s Mots. For J. on the Agency R. and for a Prelim. Inj.* at 46 ("*Pl.'s Reply*"). The Court is well aware of the general rule that the corporate entity should be

recognized absent specific exceptional circumstances. As the Federal Circuit stated, "the corporate form is not to be lightly cast aside." *3D Systems, Inc. v. Aarotech Lab., Inc.*, 160 F.3d 1373, 1380 (Fed. Cir. 1998) (citing *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990)). Defendant-Intervenor has provided no evidence nor does the record reflect exceptional circumstances or reasons why the corporate veil should be pierced in this case.

Second, even if the Court were in a position to pierce the corporate veil and hold the corporation responsible for the potential costs to Heartland, Defendant-Intervenor has provided no documentation that Heartland's parent company could prevent the harm Heartland claims to suffer. Defendant-Intervenor speculates that E.D. & F. Man Group can absorb the increased costs to Heartland; such speculation simply does not refute Plaintiff's sworn and signed documentary evidence establishing jurisdiction under §1581(h). Thus, it is the Court's determination that jurisdiction is properly exercised under §1581(h).

B.      *Plaintiff's Product Is Properly Classified under the Plain Meaning of Subheading 1702.90.40 HTSUS. Therefore, Customs' Proposed Revocation Is Not in Accordance with Law.*

Heartland's imported sugar syrup is properly classified in HTSUS 1702.90.40. The plain language of the tariff provision describes the imported product. HTSUS 1702.90.40 covers sugar syrups not containing added flavoring or coloring matter . . . containing soluble non-sugar solids greater than 6 percent by weight of the total soluble solids. Using the classic and long-standing principles of tariff classification which start with the application of the General Rules of Interpretation ("GRI") in the order in which they appear and following through with case law developed by the Supreme Court, courts of appeal, this court and its predecessor courts, there can

be little doubt that the correct classification of Heartland's syrup is within HTSUS 1702.90.40.

As described to Customs in Heartland's ruling request dated April 18, 1995, Plaintiff's product is a sugar syrup whose components are sugar, water and soluble non-sugar solids. The syrup is exclusively of sugar beet and/or cane sugar origin, approximately 70 percent by weight of dissolved solids and approximately 30 percent by weight of water. The production process includes the combining of granular raw sugar[9] with molasses, of cane or beet origin, to produce a brown sugar of approximately 93 percent polarity. This sugar is then dissolved in hot water to produce a simple syrup. AR I(37-38).

GRI 1 requires that the classification process begin with the terms of the headings and section and chapter notes. Included within Heading 1702 is "sugar syrups not containing added flavoring or coloring matter." Plaintiff's product is a sugar syrup "whose components are sugar, water and soluble non-sugar solids." AR I(37).

Although the term "syrup" is not specifically defined in the Harmonized Tariff itself, there is no doubt as to its meaning and that Plaintiff's product falls within it. According to the Concise Oxford Dictionary, syrup is "water (nearly) saturated with sugar" or "condensed sugar cane juice, part of this remaining uncrystallized at various stages of refining." (7th ed. 1987).

---

[9] Petitioners and Defendant-Intervenor here have described the product as refined beet or cane sugar, water and molasses. *See* AR I(1) at 1. However, there is no other record support for this statement and Defendant-Intervenor admitted at oral argument that plaintiff's description of its product is not controverted.

The Explanatory Notes [10] to heading 1702 also define and explain the term sugar syrup in note 1702(B) as follows:

(1) **Simple syrups** obtained by dissolving sugars of this Chapter in water.

(2) **Juices and syrups** obtained during the extraction of sugars from sugar beet, sugar cane, etc. These may contain pectin, albuminoidal substances, mineral salts, etc., as impurities.

(3) **Golden syrup**, a table or culinary syrup containing sucrose and invert sugar. Golden syrup is made from the syrup remaining during sugar refining after crystallization and separation of refined sugar, or from cane or beet sugar, by inverting part of the sucrose or by the addition of invert sugar.

Special note should be taken of number (3) above, "Golden Syrup," as Customs has attempted to change the classification on the grounds that molasses is a foreign substance within the meaning of the words "excluding any foreign substances that may have been added" (item 1702.90) when counting what soluble solids should be counted toward the 6 percent by weight. As number (3) above makes clear, Golden Syrup is a recognized table syrup made from molasses ("the syrup remaining during sugar refining after crystallization and separation of refined sugar") or from cane or beet sugar.

In addition, the record demonstrates that the commercial meaning of the term sugar syrup includes Heartland's product. *See* AR V(17) Statement of James C.P. Chen; Statement of Jean-Pierre M. Monclin; Statement of Michael B. Inkson; and Statement of Roger J. Crain. When a tariff term is not defined, commercial meaning prevails. *Lynteq, Inc. v. United States*, 976 F.2d 693, 697 (Fed. Cir. 1992). Therefore, clearly Heartland's product is syrup within the meaning of heading 1702.

---

[10] The Explanatory Notes to the HTS have often been used to interpret HTS Subheadings. *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1366 (Fed. Cir. 1998) (citing *Lonza, Inc. v. United States*, 46 F.3d 1098, 1109 (Fed. Cir. 1995)).

Plaintiff's syrup does not contain any added flavoring or coloring matter. The record reflects that this issue was discussed at a meeting held July 29, 1998 with Plaintiff's representatives and certain Treasury officials which resulted in a letter dated August 26, 1998 from Plaintiff's counsel explaining in great detail that the molasses added to the raw sugar in Plaintiff's processing cannot be considered added flavoring or coloring within the terms of the tariff. *See* AR II(1) at 1-4.[11]

Continuing to apply GRI 1 and 6[12] to the syrup leads to item 1702.90.40 because it is derived from sugar cane or sugar beet (1702.90) and has more than 6 percent soluble non-sugar solids (equal to or less than 6 percent would lead to 1702.90.10 or .20) and is not invert molasses (which would lead to 1702.90.35).

Factually, there is no doubt that Heartland's product contains more than 6 percent "soluble non-sugar solids." A test conducted by the Customs laboratory pursuant to an investigation, *see* AR I(6)(i), found the syrup more than 6 percent by weight of soluble non-sugar solids. Therefore, plaintiff's product fits the descriptive language of subheading 1702.90.40 and pursuant to its plain language is properly classified within it.[13]

Both Customs and Defendant-Intervenor argue, albeit on different grounds, that the molasses is a foreign substance in relation to the syrup under the terms of 1702.90 HTSUS "containing soluble

---

[11] Customs and Defendant-Intervenor do not pursue this issue in the case at bar.

[12] The application of GRI 6 requires comparison of co-equal subheadings and classification according to notes relating to such subheadings. There are no relevant subheading notes to consider in this case.

[13] The provision uniquely and accurately describes Heartland's product and is clearly an *eo nomine* provision. *See* 2 CUSTOMS LAW AND ADMINISTRATION § 53.3 (3rd ed. 1999) and cases collected therein. Customs does not argue that the provision is a use provision, but does contend that use should be considered when classifying Plaintiff's syrup because the importation is an artifice. *Def.'s Br.* at p. 42. The Court does not agree. *See* discussion, *infra*.

non-sugar solids (excluding any foreign substances that may have been added or developed in the product)." If so considered, the soluble non-sugar solids in the molasses would be disregarded in determining the percentage of such solids in the syrup itself bringing the percentage to less than 6 percent thus preventing classification in subheading 1702.90.40.

As Plaintiff completely and lucidly explained in its brief, there is no factual nor legal support for Customs' conclusions that molasses should be considered a foreign substance for purposes of classification of the sugar syrup. As a matter of fact and, as Plaintiff's experts confirmed, the molasses used in the production of Plaintiff's syrup is made from cane or beet as is the granular sugar. The sugar, the molasses and the resulting syrup all have the same chemical ingredients, including impurities that occur naturally in sugar.

Customs was simply wrong to conclude, as it did in its revocation ruling:

> We believe that molasses with its impurities is a foreign substance and excluded in determining the 6% rule of subheading 1702.90.1000, HTSUS. . . . The addition of the molasses to the sugar is a foreign substance containing impurities in producing the sugar syrup and, therefore, we exclude the molasses with impurities in calculating the 6% rule.

Final Notice at 53. There is ample record evidence contradicting this conclusion. *See e.g.*, AR V(17) Statement of James C.P. Chen at ¶ 4-6; Statement of Jean-Pierre M. Monclin at ¶ 7-8; Statement of Michael B. Inkson at ¶ 8-12; Statement of Roger J. Crain at ¶ 6.

Defendant-Intervenor argues that molasses is foreign with regard to the sucrose that remains when molasses is removed from raw sugar during the refining process. *Def.-Intervenor's Br.* at 49. But Defendant-Intervenor misunderstood the basic process engaged in by Plaintiff to create its imported syrup. As it is raw sugar, which itself contains molasses, that is combined with additional molasses to create Heartland's syrup, the molasses cannot be considered foreign.

As Plaintiff correctly points out, its syrup, molasses and raw sugar are all composed of the

same chemical ingredients in varying proportions. *Pl.'s Reply* at 16; *see also* AR V(17) Statement of James C.P. Chen; Statement of Michael B. Inkson (sugar experts stating that molasses cannot be said to be a foreign substance in relation to sugar). Therefore, neither substance can be considered foreign in relation to the other. Defendant-Intervenor also contends that molasses must be considered a foreign substance for purposes of this classification exercise or other portions of the sugar cane product could be included to make up the 6 percent solids. However, Defendant-Intervenor ignores the modifier "soluble." Cane leaves and bagasse would never fit the description "soluble non-sugar solids" and, therefore, cannot be compared to molasses when determining which non-sugar solids should be considered foreign substances.

The foreign substances argument is also not in accordance with law. It cannot be reconciled with the language of HTSUS or the Explanatory Notes. The word "foreign" appears in subheading 1702.90 modifying sugar syrups derived from sugar cane or sugar beets.

> Containing soluble non-sugar solids (excluding any *foreign substances* that may have been added or developed in the product) equal to 6 percent or less by weight of the total soluble solids.

There is ample record evidence that Customs' interpretation of "foreign substances" to include anything that is itself "derived from sugar cane or sugar beets" is unreasonable and an abuse of discretion.

In the revocation, Customs stated "molasses is not sugar derived from the refining of sugar cane or beets" and that the "mixture of molasses with sugar is not a refining process for raw sugar, and the addition of water to such a mixture does not create a 'sugar syrup' derived from a refining process from sugar cane or sugar beet." Final Notice at 52-53. However, Customs *sua sponte* added the word "refining." HTSUS 1702.90 refers simply to "derived from sugar cane or sugar beets." Thus, so long as a sugar or a syrup is "derived from sugar cane or sugar beets," it fall within HTSUS

1702.90. By the same token, so long as a "substance" is "derived from sugar cane or sugar beets," as the molasses used in Heartland's sugar syrup surely is, it cannot be "foreign" to HTSUS 1702.90.

The ENs for heading 1702 further refute Customs' position that molasses is "foreign." One of EN 1702(B)'s illustrations of sugar syrups covered by heading 1702 is described as follows:

> 2. **Juices and syrups** obtained during the extraction of sugars from sugar beet, sugar cane, etc. These may contain pectin, albuminoidal substances, mineral salts, etc., as impurities.

EN 1702(B) (emphasis in original). By expressly including within heading 1702 a syrup containing "pectin, albuminoidal substances, mineral salts, etc., as impurities," the EN directly contradicts Customs' position that such impurities in molasses render molasses a substance "foreign" to sugar syrup.[14]

Customs also argues that the molasses must be considered foreign because "[i]f something is added or developed in the product that artificially increases the soluble non-sugar solids, that addition is a 'foreign substance' for purposes of subheading 1702.90." *Def.'s Br.* at 51. This argument is based on a misunderstanding of Plaintiff's pre-importation process and the case law dealing with artifice or deceit. Record evidence shows a clear commercial purpose for combining molasses with raw sugar in the refining process. *See* AR V(17) Statement of Jean-Pierre M. Monclin at ¶ 6 ("In sugar processing such mixing of molasses with granular sugar is common practice... it is the principal way to adjust stream purity during crystallization."); Statement of Michael B. Inkson at ¶ 13 ("[M]ixing molasses with higher purity streams [granular or liquid] is quite common in the production of sugar products. The process is designed to produce final sugar products of particular

---

[14] Customs seems to have abandoned the argument advanced in its revocation that molasses must be a "foreign" substance under subheading 1702.90 because "molasses syrups are classified in heading 1703" not in heading 1702, since the revocation held classification within subheading 1702.90.10/20.

polarity."). Customs' characterization of Plaintiff's adding of molasses to its sugar syrup as an artifice or deceit is not supported by case law. *See* discussion*, infra.*

Therefore, the Court can sustain none of the arguments presented by Customs or Defendant-intervenor that molasses should be considered a foreign substance for the purpose of classifying Plaintiff's sugar syrup.

C.      *The Record Evidence Does Not Support Classifying the Sugar Syrup Outside the Plain Meaning of Subheading 1702.90.40 HTSUS.*

As discussed above, the sugar syrup in question is properly classified under the plain meaning of subheading 1702.90.40 HTSUS, and Customs' classification of the syrup outside of the plain meaning is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.[15] Customs and Defendant-Intervenor argue that the sugar syrup is not classified within the plain meaning of subheading 1702.90.40 HTSUS in several ways. First, they argue that the legislative intent of the relevant HTSUS provisions is to prevent anything that competes with raw or refined sugar from entering outside of the quota. Second, they argue that the sugar syrup is not to be classified in its condition as imported because the process is an artifice or deceit. Accordingly, use may be consulted since the judicial precedent recognizes an exception to the general rule that an article is to be classified in its condition as imported. Third, although neither defend the position, Customs reasoned that the sugar syrup in question would have fallen under the quantitative

---

[15] In a case brought under 28 U.S.C. § 1581(a) the court reviews Customs decision *de novo* on the record before the court. In a case brought pursuant to 28 U.S.C. § 1581(h) the agency record is reviewed and the standard of review is different. *See* discussion, *infra*. Even though the classification decision itself is a legal question, *see National Advanced Sys. v. United States*, 26 F.3d 1107, 1109 (Fed. Cir. 1994), the procedural posture of this case requires a discussion of why the agency action cannot be sustained under the applicable standard of review.

restrictions of Tariff Schedules of the United States ("TSUS") and thus properly are classified within the quantitative restriction of the HTSUS.

1.      The Legislative History Does Not Demonstrate a Clear Legislative Intent to Exclude the Sugar Syrup at Issue.

As discussed *supra*, Customs argues that while falling into the literal language of subheading 1702.90.40 HTSUS, the sugar syrup falls outside the spirit of the statutory provision because the purpose is to subject those products that compete directly with sugar to a quantitative quota restriction.  In support of this proposition Customs refers to a 1937 hearing held before the Subcommittee of the House Committee on Agriculture.  A witness testified that excluding sugar syrups with greater than a certain percentage of soluble non-sugar solids would allow syrup of cane juice to enter while barring other syrups that could be refined into products competing with raw and refined sugar. *See Sugar: Hearings on H.R. 5236 Before the Subcommittee of the House Committee on Agriculture*, 75th Cong. 41-44 (1937).  Furthermore the witness testified that it was "practically impossible to define sugar sirup of cane juice satisfactorily for the purpose of administering quotas and taxes." *See id.* at 44.

From this discussion, Customs and Defendant-Intervenor draw the conclusion that any sugar syrup that competes with domestic raw or refined sugar must be classified in a provision that has a quantitative limitation, even if the product falls within the express and unambiguous language of a subheading not subject to such restrictions.  Structurally and as a matter of sound statutory interpretation this argument fails.

Structurally, two provisions within Chapter 17 of the HTSUS explicitly allow competing sugar to enter without being subject to quantitative restrictions.  Subheadings 1703.10.30 HTSUS and 1703.90.30 HTSUS both allow molasses to enter which is imported for commercial extraction

of sugar or for human consumption. Additionally, not all sugar products are subject to TRQs such as: lactose syrup (1702.11.00 HTSUS); unblended glucose syrups (1702.30.40 HTSUS and 1702.40.40 HTSUS); unblended fructose syrups (1702.60.40 HTSUS); invert molasses (1702.90.35 HTSUS). Two things are thus apparent from the current quota scheme under the HTSUS. One is that Congress did not intend to exclude all competing sugar products from entry without quantitative limitations. Another is that the HTSUS is fundamentally different from prior tariff law in the way it addresses sugar products.

As a matter of sound statutory interpretation the argument that the legislative history controls the express language of the statute also fails. For one thing, the legislative history cited here involves the testimony of one witness with the interrogatories of two members of Congress. To take this bit of legislative history and give it more weight than the statutory language would contravene longstanding principles detailing legislative history's proper weight. Further, it is not clear that the legislative intent Customs and Defendant-Intervenor propose is the only one. *See Robert G. Lynch Co. v. United States*, 49 C.C.P.A. 74, 79 (1967) (noting that "[t]he intent of Congress throughout the history of tariff legislation on sugar since 1913 has been to assess duties on the basis of the polariscopic sugar degree content, not upon the ultimate or intended use of the sugar."). The legislative history accompanying the enactment of the HTSUS states that it is meant to be revenue neutral and that the "[e]nactment of the tariff and quota treatment provided in this subtitle is intended to supersede and replace existing treatment as a matter of domestic law." *See* H.R. CONF. REP. NO. 100-576, at 548 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1581. When presented with many different Congressional intents and one clearly worded statutory provision, the better course is to follow the language of the statute. If Congress wishes to place the sugar syrup in question under quota it is free to do so through duly enacted legislation. However, Customs, as an executive agency

may not; its role is to interpret and apply the HTSUS, *see* H.R. CONF. REP. NO. 100-576, at 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582. In this case its interpretation and application was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

2.     Customs' Determination That Plaintiff Engaged in Artifice or Deceit Is Not Supported by the Record Evidence Nor Is it a Correct Application of Judicial Precedent, and Thus Is Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Not in Accordance with Law.

Customs and Defendant-Intervenor argue that because molasses remains after the sugar syrup is refined following importation, and since some of the molasses is then returned to Canada, Plaintiff has engaged in artifice or deceit. The Court does not agree.

First, Plaintiff, pursuant to the provisions of 19 C.F.R. § 177, obtained an advance ruling on the classification of the merchandise. Neither Customs nor Defendant-Intervenor dispute that the submissions to Customs were legitimate. Rather, the claim is made that Plaintiff's failure to describe the post-importation processing deprived Customs of relevant information, and thus constituted artifice or deceit. However, the regulation clearly states that a description of an article's chief use is required only when germane to the relevant classification. *See* 19 C.F.R. §177.2(b)(2)(ii) (1999). Since, as discussed *supra*, subheading 1702.90.40 HTSUS (nor for that matter subheadings 1702.90.10 and 1702.90.20 HTSUS) is not a use provision, Plaintiff was not required by the express language of the regulation to describe the sugar syrup's use. Furthermore, Customs had the opportunity to request an additional description, including a description of use when it asked for samples, and did not do so.

Second, following an investigation, the sugar syrup's use was conclusively made known to

Customs and in an internal memorandum it was determined to be correctly classified within subheading 1702.90.40 HTSUS. *See* A.R. at IV(9). The memorandum states the principle of classification law that a good is to be imported in its condition as imported and that Customs cannot consider what happens to the goods once they are legally imported. *See id.* Moreover, the memorandum states that the entire process is legal under the ruling.[16] *See id.*

Third, Customs had no record evidence on which to conclude that the sugar syrup produced in its condition in Canada was not at an intermediate stage of production.[17] In fact, the record evidence shows that the process of combining granular raw sugar with molasses, adding water and heating is common in sugar refining operations. *See* AR V(17) Statement of James C.P. Chen, ¶ 5; Statement of Jean-Pierre M. Monclin, ¶ 6 ("In sugar processing, such mixing of molasses with granular sugar is common practice."); Statement of Michael B. Inkson, ¶ 13 ("The Customs Service seems to have the misconception that the mixing of granular sugar and molasses is somehow abnormal. To the contrary, mixing molasses with higher purity streams (granular or liquid) is quite

---

[16] While the Court does not consider this internal memorandum with respect to the ultimate classification of the merchandise, it is relevant on the issue of artifice or deceit. Customs' rationale was that it did not have critical information on the sugar syrup's use at the time it issued the initial ruling and that it reconsidered its position in light of information brought to its attention in the petition. The memorandum, written prior to the filing of the petition, directly contradicts Customs' rationale and is considered by the court for the limited purpose of whether the agency was deceived. As the memorandum indicates, the initial decision would have been unaffected if use had been, although not required to be, described.

[17] Both Customs and Defendant-Intervenor recognize that goods may legitimately be imported at various stages of manufacturing or processing, even if at an artificially interrupted point, to obtain lower rates of duties. *See Def.'s Br.* at 34; *Def.-Intervenor's Br.* at 36.

Customs asked the Plaintiff repeatedly for what commercial use the product had in its condition as imported without removing molasses. This question ignored the evidence Plaintiff submitted that combining raw sugar with molasses was a legitimate step in the refining process. Additionally, as discussed *infra*, the use of the merchandise was irrelevant to the proper classification.

common in the production of sugar products."). Raw sugar's core is almost pure (99.6-99.8) sucrose, while the surface of the crystal is covered with a partially dried syrup containing much less sucrose. *See* James C.P. Chen & Chung Chi Chou, CANE SUGAR HANDBOOK 485 (12th ed. 1993). Molasses, which contains much less sucrose, is combined with the raw sugar in the desired amount to obtain the final product. *See* AR V(17) Statement of James C.P. Chen, ¶ 5; Statement of Jean-Pierre M. Monclin, ¶ 4, 6; Statement of Michael B. Inkson, ¶ 13. It is noteworthy that Customs does not contest the general principle that combining raw sugar with molasses to adjust the purity is a common practice, yet it proceeds in what can only be characterized as a circular argument that in this case the process is designed to avoid the quantitative limitation.[18]

Moreover, the record evidence does not contain a single submission stating that the combination of *raw* sugar with molasses is not an intermediate step in the refining process. Notably, the submissions that mention the process at all state or imply that combining *refined* sugar with molasses is not a legitimate commercial practice. *See* AR I(1) Petition of January 14, 1998 at 1; II(20) Letter of September 25, 1998, from Sen. Kent Conrad, *et al.* V(1), (2), (4), (14). The Court has no reason to address that contention since the ruling letter request makes it clear, as well as does the record evidence, that Plaintiff's process combines granular raw sugar with molasses.[19] If the Defendant-Intervenor had information that the process described by the Plaintiff was incorrect, it was obliged to include such information on the agency record. Customs improperly based its decision

---

[18] The Court addresses the Defendant's brief in the discussion of the caselaw holding an importer has the right to fashion his or her merchandise to obtain the lowest rate of duty available, *infra*.

[19] The Robinson declaration, although not on the agency record, is remarkable for what it does not say more than what it does. In the declaration, both the premise and conclusion are based on the process of combining *refined* sugar with molasses. *See Def.-Intervenor's Br.* at Annex 24, Declaration of Jeffrey Robinson, ¶ 4, 7-8, 13-15.

on conclusory assertions that refined not raw sugar was used to prepare the syrup. In its second chance, through the Robinson declaration, the Defendant-Intervenor again failed to include any information that refined sugar is used, nor, apparently, could it obtain an expert statement that the process of refining raw sugar with molasses is an illegitimate commercial process. Based on the record evidence, Customs had no basis to conclude that combining raw sugar with molasses was not a legitimate step in a refining operation. Accordingly, for each of the three reasons discussed above, Customs' determination that the process Plaintiff employs "is not a genuine step in manufacturing or production of an article[]," *see* Final Notice at 44, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

As a result of its flawed finding on the genuineness of the manufacturing process, Customs incorrectly applied the abundant judicial precedent holding that an article must be classified in its condition as imported. Customs noted that an importer "should be allowed to choose to import its merchandise at any step that obtains the most favorable treatment[]" and that "[i]f the syrup was further used in its condition as imported, in the next step in producing an article of commerce, this may satisfy the tariff engineering concept." *See* Final Notice at 44-45. Customs clearly stated its position: "that the processing in this case is not legitimate tariff engineering. But rather, it is merely 'disguise or artifice' intended to escape a higher rate of duty such as a quota tariff rate." Final Notice at 45. Customs had no basis to conclude that Plaintiff engaged in artifice or deceit to obtain a favorable classification of its merchandise and its application of the relevant judicial precedent governing tariff engineering as applied to the facts before it was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

The Supreme Court first announced the principle that a manufacturer has the right to fashion goods to avoid the burden of high duties, coincidentally, in a sugar case. *See Merritt v. Welsh*, 104

U.S. 694, 701 (1881).[20] At the time, the duty was assessed on sugar based on its color. The collector

of the port of New York, defendant, claimed "that color was imparted to the sugars in the course of

manufacture, by the use of an extra quantity of lime . . . or by the introduction of molasses . . . ." *Id.*

at 696 (the trial court found the evidence inadmissible). The Court went on to state the issue as

whether "(supposing the sugars are not artificially colored for the purpose of avoiding duties *after*

being manufactured) their dutiable quality is to be decided by their actual color . . . or by their

saccharine strength . . . ." *Id.* at 700 (emphasis added). In fact, the Court remarked "[i]f the

manufacturer uses . . . bleaching processes in order to make his sugars more salable, why may he not

omit to do so in order to render them less dutiable; nay, why may he not employ an extra quantity

of molasses for that purpose?" *Id.* at 704. The Court noted that if color was added to the sugar

following manufacture that "might be a different matter." *Id.* at 705. In this case, on the agency

record before the Court, there is no evidence that *refined* sugar is combined with molasses to produce

the sugar syrup, and thus the limitation on the Court's holding is not applicable.

After determining that Congress had clearly adopted a color test, the Court had this to say:

> Perhaps Congress may have acted under a mistaken idea that color
> would always indicate quality. Perhaps, up to the time that the law
> was passed, as the processes of manufacture had been conducted,
> color was an approximate, or general indication of quality. Suppose
> this to be so, does it derogate from the fact that color was the standard
> which Congress, with the lights which it had, saw fit to adopt? Does
> it not tend to fortify that fact? If it be found by experience that the
> standard is a fallacious one, can the executive department supply the
> defects of the legislation? Congress alone has the authority to levy
> duties. Its will alone is to be sought.

---

[20] The Court sees no reason, nor has it been presented with one by Customs, to distinguish between duties and quota restrictions. The effect of the TRQ is to impose a higher rate of duty on subject merchandise entering over the quota. Thus, the principle of fashioning merchandise to obtain the lowest rate of duty applies equally to fashioning merchandise to avoid a provision that will subject the merchandise to a TRQ.

*Id.* at 700. In this case, Congress has provided a clear and unambiguous test: the quantity of soluble non-sugar solids. Following the Supreme Court in *Merritt*, this Court will not disturb Congress' will.

Furthermore, the Court set out the exception to the rule that an importer has the right to fashion his or her merchandise to obtain the lowest rate of duty "[s]o long as no deception is practised, so long as the goods are truly invoiced and freely and honestly exposed to the officers of customs for their examination, no fraud is committed, no penalty is incurred." *Id.* at 704. As discussed above, Plaintiff obtained an advance ruling describing the sugar syrup and its manufacturing process, and a subsequent investigation revealed that Plaintiff was complying with the terms of the advance ruling. Thus, Plaintiff's practice does not fall within the exception announced in *Merritt*. The Supreme Court, the Federal Circuit and its predecessor, and this court and its predecessor have repeatedly reaffirmed the principle in *Merritt*.

In *United States v. Schoverling*, 146 U.S. 76 (1892), an importer entered gunstocks and colluded with another firm to import the barrels separately to avoid the higher rate of duty assessed on fully assembled shotguns.. The Court dismissed the United States' argument that the transaction was a fraud upon the statute by stating that "the intent of the importers to put the gunstocks with barrels separately imported, so as to make here completed guns for sale, cannot affect the rate of duty on the gunstocks as a separate importation." *Id.* at 81 (citing *Merritt*, 104 U.S. 694); *see also Seeberger v. Farwell*, 139 U.S. 608, 610 (1891) (holding that mixing just enough cotton with wool to secure a lower rate of duty with no valid commercial purpose for the addition was within the importer's legal right).

In *United States v. Citroen*, 223 U.S. 407, 413-416 (1912), the issue was whether pearls, which had been drilled with holes and strung for display, were properly classified as jewelry, at a higher duty rate, or pearls. Relying on the plain language of the statute, the Court found that the pearls had to be classified as pearls in their natural state, not strung or set. *See id.* at 424. Once again, the Court used the analysis in *Merritt* that "when the article imported is not the article described as dutiable at a specified rate, it does not become dutiable under the description because it has been manufactured or prepared for the express purpose of being imported at a lower rate." *Id.* at 415 (citing *Merritt*, 104 U.S. at 704; *Seeberger*, 139 U.S. 608, 611).

On repeated occasions the United States Court of Customs Appeals and its successor courts have applied the *Merritt* principle. *See United States v. Hannevig*, 10 Ct. Cust. App. 124, 128 (1920) (holding that engine parts later used to make engines were properly classified as parts); *United States v. International Forwarding Co.*, 15 Ct. Cust. App. 198, 201 (1927) (holding that an importer could import one large blanket at a lower duty rate even if it later made it into two smaller ones); *Corporacion Argentina de Productores de Carnes v. United States*, 32 C.C.P.A. 175, 184 (1945) (holding that the addition of a enough cereal to dog food to place it in a tariff provision with a lower rate of duty was within the importer's right to fashion merchandise to obtain a lower rate of duty);[21]

---

[21] *Corporacion Argentina* provides the legal answer to Customs' questions posed as to why Plaintiff does not add enough molasses so that at the end of the refining process there is no excess. As the court noted, the addition of the cereal held the meat together, thus serving a satisfactory food purpose. *See Corporacion Argentina*, 32 C.C.P.A. at 181-82. Customs does not dispute that combining granular raw sugar and molasses serves a valid purpose of adjusting the polarity of a sugar product, but argued that in this case the amount of molasses added was specifically for the purpose of exceeding the 6 % requirement. Under the reasoning in *Corporacion Argentina*, adding enough molasses to exceed the 6% threshold is acceptable just as were the actions of the importer who "was careful to try to add that quantity [of cereal] which was regarded as substantial by the customs officials." *Id.* at 185 (plaintiff had sought advice beforehand as well).

*Robert G. Lynch Co. v. United States*, 49 C.C.P.A. 74, 80 (1962) (stating that in deciding the proper classification of the merchandise the importer's motivation was immaterial and ultimately affirming the finding that the merchandise was raw sugar dyed green); *accord Fries Bros. v. United States*, 4 Treas. Dec. 850, 852-54 (1901) (recognizing the principle that importers have the right to fashion merchandise to obtain the lowest rate of duty and that classification is decided on the merchandise at the time of importation but applying the exception that if something is added *after* manufacture it may be disregarded); *Pasadena Firearms Co. v. United States*, 56 Cust. Ct. 331, 337 (1966) (holding that the importer's intent to combine pistol barrels and frames imported in separate shipments was irrelevant to the correct classification).

Customs incorrectly applied the *Merritt* line of precedent to the evidence on the record. On repeated occasions courts have accepted artificial steps in the manufacturing process done to obtain the lowest rate of duty. Removing the string from pearls which were later restrung, colluding to import gunstocks separate from barrels later combined, adding sufficient amounts of cotton and cereal without any corresponding commercial purpose are all processes designed to obtain lower duty rates. Plaintiff's process, as described by the evidence on the agency record falls squarely within such practices. There was uncontroverted evidence on the record that Plaintiff's manufacturing process was common in sugar refining operations, but even if it were not, the motive of the importer in fashioning his or her merchandise is simply not a relevant inquiry. In fact, to the extent motive is relevant, an importer who intends to fashion merchandise solely for the purpose of obtaining the lowest rate of duty is within his or her legal right. Customs' disregard or misinterpretation, it matters not which, of the *Merritt* line of precedent was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

Equally well established precedent, from the same sources as above, state that absent a use

provision, an article is to be classified in its condition as imported.[22] In *Worthington v. Robbins*, the Supreme Court first annunciated the principle that goods are to be classified in their condition as imported. *See Worthington*, 139 U.S. at 341. The merchandise at issue was white hard enamel, which had various uses. *Id.* at 340. However, in the condition in which it was imported it could only be used, and in fact was used, to make watch faces. *Id.* Customs and the Defendant-Intervenor attempt to distinguish this case and others that build upon it on the ground that the products at issue have a recognized commercial identity regardless of subsequent use. *See e.g. Dwight v. Merritt*, 140 U.S. 213, 219 (1891) (applying the rule in *Worthington* to determine the correct classification of the merchandise); *Schoverling*, 146 U.S. at 82 (holding that the dutiable classification of gunstocks must be made on their condition as imported); *Citroen*, 223 U.S. at 414-15 (noting the well established rule that classification of articles must be determined on their condition as imported); *accord United States v. Irwin*, 78 F. 799, 801 (2d. Cir. 1897) (applying the rule in *Worthington* to gunstocks and barrels imported on the same ship and determining that in their condition as imported they were breach loading shotguns); *accord United States v. Winkler-Koch Eng'g. Co.*, 41 C.C.P.A. 121, 122 (1953) (noting "[i]t is academic that the classification of merchandise for duty purposes is governed by its condition as imported . . . ."); *Rico Import Co. v. United States*, 12 F.3d 1088, 1090 (1993) (holding that despite alleged uses articles must be classified in their condition as imported); *Mita Copystar America v. United States*, 21 F.3d 1079, 1082 (1994) (noting the well settled principle of law that merchandise is classified in its condition as imported thereby precluding classification as unmixed products because the fact that the substances had to be mixed prior to use was not relevant);

_____

[22] That the competing provisions of the HTSUS are not use provisions is not disputed by the parties. Rather, Defendant and Defendant-Intervenor claim use can be looked at because of artifice or deceit, which as discussed above, is incorrect.

*accord Cook v. United States*, 49 Cust. Ct. 11, 13 (1962) (holding that wheat unfit for human consumption at the time of importation though later used in an article fit for human consumption must be classified in its condition as imported); *Pasadena Firearms*, 56 Cust. Ct. at 334 (applying *Worthington* to the separate importation of pistol frames and barrels that the importer later combined); *Peter J. Schweitzer Div., Kimberly-Clark Corp. v. United States*, 57 Cust. Ct. 9, 13 (1966) (holding that flax straw was specifically enumerated without qualification as to use and despite stipulation that it was to be used for paper making, it had to be classified in its condition as imported); *Hardwood Manufacturing Co. v. United States*, 7 CIT 288, 292 (1984) (holding that absent a use provision, the article had to be classified on its condition as imported).

From the line of cases above, Customs and Defendant-Intervenor admit that an importer has the right to stop a legitimate manufacturing process at an artificial point and import the merchandise to obtain the lowest rate of duty. Based on the record it compiled, Customs had no basis to conclude that Plaintiff was not engaged in such a practice. All of the evidence suggested it was doing exactly that. The record evidence indicates and does not contradict that combining raw sugar with molasses is a legitimate step in the refining process. Additionally, it is undisputed that Plaintiff operates a refining operation in the United States which employs a substantial number of people. *See e.g. Schoverling*, 146 U.S. at 80 (noting that importing gun barrels and stocks promoted use of domestic labor). Thus, Plaintiff's operation falls directly within the line of cases which hold that an importer has the right to stop production at the most favorable time for duty purposes. Accordingly, Customs determination that it was appropriate to look at the sugar syrup's use following importation was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

Against the overwhelming number of cases holding that an importer may fashion his or her merchandise to obtain the lowest rate of duty and that an article is to be classified in its condition

as imported, two cases are cited as authority for the proposition that quota avoidance schemes are

disallowed by the courts. Customs reliance on *Savannah Sugar Refining Corp. v United States* is

misplaced. *See* Final Notice at 45, 50-51. As the court stated, the only important issue was whether

"the imported merchandise [was] a sugar sirup within the meaning of paragraph 502 . . . either

directly or by virtue of the similitude provision . . . ." *Savannah Sugar Refining Corp.*, 20 C.C.P.A.

272, 277 (1932). Because the court in *Savannah Sugar Refining* was attempting to determine

whether the article in question was sugar syrup within the meaning of the tariff provision, it did not

engage in the analysis set forth in the *Merritt* line of cases, nor in the *Worthington* line and, therefore,

should not be followed. Furthermore, there is no evidence in the opinion that the article was at an

intermediate stage of processing, which, as discussed *supra*, is the case before this Court. Finally,

Customs urges the Court to ignore the holding of the case and to employ the analysis set forth in

dictum. *See Def.'s Br.* at 49. For reasons that need no explanation, the Court declines this invitation.

Customs relies also on *Arbor Foods, Inc. v. United States*, 9 CIT 119, 607 F. Supp. 1474

(1985), which is readily distinguishable. *See* Final Notice at 51. In that case, the importer mixed

pure sugar of Canadian origin with corn syrup solids of United States origin in a warehouse

designated as a foreign trade zone ("FTZ"). *See id.* at 120, 607 F. Supp. at 1476. The importer then

brought the mixture from the FTZ territory into United States Customs territory, which were

separated only by a yellow line. *See id.* After the product entered United States Customs territory

the importer simply screened out the corn syrup solids and returned them to the FTZ territory for the

next "importation." *See id.* The court recognized the principle that duty must be assessed on an

article in its condition as imported but because the relevant tariff provision was one in which chief

use was incorporated, found the principle did not apply. *See id.* at 122, 607 F. Supp. at 1477. Since

the doctrine of chief use required following an item into the commerce of the United States, it was appropriate for Customs to demand evidence of the possible uses of the product. *See id.*

It is clear that in the case before the Court a much different process is employed and a different analysis required. First, the sugar syrup in question can not be screened to obtain its constituent parts. Next, the evidence on the record demonstrates that combining raw sugar with molasses is a legitimate step in refining sugar. As noted by Customs in its brief, the sugar is in raw form before it enters the United States, while the final product is liquid sucrose. *See Def't Br.* at 18. In *Arbor Foods*, no transformation occurred, the product before and after importation was identical. Finally, while a great deal of the molasses is returned to Canada, some is sold for animal feed and some is lost in the process.[23] Furthermore, the molasses must be reconstituted prior to being used again. Since the process is different, the analysis must be that of the *Merritt* and *Worthington* line of cases. While it may be that Plaintiff interrupts the refining operation at an artificial point, or at one that other refiners do not, this fact alone does not matter since this is the importer's right in fashioning merchandise to obtain the lowest rate of duty. Finally, the *Arbor Foods* court employed a chief use analysis which is not relevant in the present case.

Another principle on which Customs relied was that courts may disregard a substance added to a product for a legitimate commercial purpose, even though substantial, in order to classify the merchandise. *See* Final Notice at 45, 50. In support of this principle, Customs cites *Aetna Explosives Co. v. United States*, 9 Cust. App. 298 (1919) and *Varsity Watch Co. v. United States*, 34 C.C.P.A. 155 (1947).

---

[23] Plaintiff submitted sales invoices to Customs showing the sales of animal feed. Customs noted in the Final Notice that any sales were *de minimis* or fugitive uses. Regardless, the sale of some of the molasses is yet another reason this case is unlike *Arbor Foods*.

In *Aetna Explosives*, 9 Ct. Cust. App. at 299. the importer added twenty percent of sulphuric acid to nitric acid for the purpose of protecting the iron tank cars in which the acid was shipped. The importer desired only to import nitric acid, but the rules of the Interstate Commerce Commission required the addition of the sulphuric acid and the amount. *See id.* The merchandise was classified as a chemical mixture, subject to a higher rate of duty than nitric acid. *See id.* The court stated that the true rule was that "the introduction of a quantity of sulphuric acid solely for the purpose of rendering the transportation of nitric acid safe, and which does not result in a usable mixture, is more in the nature of an act of shipment than an admixture . . . ." *Id.* at 306. The court applied the principle that in such circumstances, "the construction of the statute most favorable to the importer is to be adopted." *Id.* at 307 (citation omitted).

*Aetna Explosives* is wholly inapplicable to the present case. First, it does not fall within the controlling *Merritt* or *Worthington* line of precedent. In *Aetna Explosives* the importer added the sulphuric acid not of its volition but to comply with regulations. In this regard, *Aetna Explosives* has nothing at all to do with importers fashioning merchandise to obtain the lowest rate of duty. *See id.* at 306 ("[I]t is . . . neither a usable mixture *nor one which the importer purposely, as a process of manufacture, started to make such*.") (emphasis added). Furthermore, the court analyzed the term "mixture" in the statute and determined that the addition of the sulphuric acid did not fit the definition. *See id.* Finally, the court supported its holding by referring to a principle of construction that ambiguities in a tariff/revenue statute are resolved in favor of the importer. The court's qualification further limits the relevance of *Aetna Explosives* to the present case.

In *Varsity Watch*, the importer of watch cases added an amount of gold so small that it was difficult to obtain a quantitative analysis. *See Varsity Watch*, 34 C.C.P.A. at 157. The importer claimed that the gold should have been disregarded under the rule *de minimis non curat lex*, the law

does not concern itself with trifles. Relying on the plain language of the statute, the court found that

Congress intended to include all watch cases containing gold, no matter how small the amount. *See*

*id.* at 163. Because the importer intended to add the gold to enhance the value of the watch, and the

addition was not accidental, unintentional or undesired, the court found that the rule of *de minimis*

*non curat lex* did not apply.

Customs cited *Varsity Watch* for its summation of the cases applying the *de minimis* rule.

The *Varsity Watch* court noted:

> that certain amounts of an ingredient, although substantial, may be
> ignored for classification purposes depending upon many different
> circumstances, including the purpose which Congress sought to bring
> about *by the language used* and whether or not the amount used has
> really changed or affected the nature of the article and, of course, its
> salability.

*Id.* at 162-63 (emphasis added). In the statute under consideration, Congress has employed a test,

the very nature of which requires deciding the amount of soluble non-sugar solids present. If the

syrup contains greater than six percent, the syrup falls under subheading 1702.90.40 HTSUS, if it

does not, under subheading 1702.90.10 HTSUS. In this instance, the statute has concerned itself not

with trifles, but with an exact measurement. Moreover, like *Corporacian Argentina*, the importer

has fashioned the merchandise to obtain the lower rate of duty. *See Corporacion Argentina*, 32

C.C.P.A. at 185. Accordingly, to the extent Customs relied on the *de minimis* rule to exclude the

soluble non-sugar solids contained in the molasses its action was arbitrary, capricious, an abuse of

discretion, and otherwise not in accordance with law.

Since the record evidence demonstrates that Plaintiff did not engage in artifice or deceit to

obtain the initial ruling under subheading 1702.90.40 HTSUS and the long line of judicial precedent

illustrates that Plaintiff engaged in legitimate tariff engineering, classifying the sugar syrup outside

of the plain meaning of the statute was arbitrary, capricious, an abuse of discretion, and otherwise

not in accordance with law.

3.      The TSUS Provisions Are Not Relevant In Determining the Correct Classification of the
        Sugar Syrup.

Although neither Customs nor Defendant-Intervenor press the argument in their briefs,[24]

Customs provided further justification for its classification under subheading 1702.90.10 HTSUS

on the basis of the quota provisions in the TSUS. *See* Final Notice at 51-53. After examining

various provisions of the TSUS, Customs concluded that the sugar syrup would have been classified

in item 155.75 TSUS and subject to an absolute quota.[25] Customs is wrong for several reasons.

First, it is apparent that the TSUS involves an entirely different law than the HTSUS

provisions governing sugar products. The HTSUS breaks sugar products out into several

subheadings: 1701 for cane or beet sugar and chemically pure sucrose in solid form; 1702 for other

sugars, including sugar syrups; 1703 for molasses resulting from the extraction or refining of sugar;

and 1704 for sugar confectionery (including white chocolate), not containing cocoa. Customs itself

---

    [24] Indeed, when asked by the Court at oral argument if Customs was abandoning its
position counsel replied it was not, but noted that it was not a particularly strong position.

    [25] Customs stated:
        155.75, TSUS, provided for sugars, sirups, and molasses, described
        in this subpart, flavored: and sirups, flavored or unflavored,
        consisting of blends of any of the products described in the subpart.
        Under item 958.10, blended sirups in item 155.75, containing
        sugars derived from cane or beet and capable of being further
        processed or mixed with similar ingredients and not for the
        ultimate consumer, and under item 958.15, articles containing over
        65 percent by dry weight of sugars derived from sugar cane or
        sugar beets, were subject to a 'none' absolute quota.
Final Notice at 52.

recognized that when the TSUS was converted to the HTSUS, "Item 155.75, TSUS, in part, became subheadings 1702.30.40, 1702.40.00, and 1702.60, HTSUS." Final Notice at 52.

Second, under the TSUS the sugar syrup in question would more likely have been classified under TSUS 155.35. The superior heading provided for "Sugars, syrups, and molasses, derived from sugar cane or sugar beets" and TSUS heading 155.30 provided for "Not principally of crystalline structure and not in dry or amorphous form . . . [containing less than six percent soluble non-sugar solids]." However, since the sugar syrup in question contains greater than six percent soluble non-sugar solids it would have fallen within TSUS 155.35, an "Other" provision not subject to quota and covering those items enumerated in TSUS 155.30 but containing more than six percent soluble non-sugar solids.

Customs' determination that the sugar syrup would have fallen within TSUS 155.75 fails to account for TSUS General Interpretive Rule 10(c), which provided that "an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it . . . ." Since TSUS 155.35 was the more specific heading, the sugar syrup would have fallen within it, not subject to quota.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that the sugar syrup before it, as described in AR I(37-38), requesting a ruling, is correctly classified under subheading 1702.90.40 HTSUS. Customs' rationale for classifying the sugar syrup in a manner inconsistent with the plain meaning of the statute was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Judgment will enter accordingly.


Dated: _____                    _____
      New York, NY                                         Judith M. Barzilay
                                                             Judge