**Slip Op. 02-22**

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____

Heartland By-Products, Inc.,          **:**

           Plaintiff,           **:**

           **:**        **Court No.  99-09-00590**

          v.           **Before: Barzilay, Judge**

           **:**

United States of America,           **:**

           Defendant,           **:**

           and           **:**

United States Beet Sugar Association,           **:**

           Defendant-Intervenor.           **:**
_____**:**

[Plaintiff's Motion for Entry of Judgment denied and Case Dismissed.]

Decided: February 26, 2002.

_Mayer, Brown, Rowe & Maw,_ (_Simeon M. Kriesberg), Andrew A. Nicely_, _Eldad Z. Malamuth_, and _Serko & Simon, David Serko, Daniel J. Gluck, Jerome L. Hanifin_ for Plaintiff.

_Robert D. McCallum, Jr._, Assistant Attorney General; _John J. Mahon,_ Acting Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, Department of Justice (_Aimee Lee_); _Karen P. Binder_, Office of Assistant Chief Counsel, International Trade Litigation, Customs Service, (_Yelena Slepak_) and _Allan Martin_, Associate Chief Counsel, Customs Service, (_Ellen Daly_), of counsel, for Defendant.

_Wilmer, Cutler & Pickering,_ (_Lewis J. Liman_), _Rick A. Bierschbach_, for Defendant-Intervenor.

_American Association of Exporters and Importers,_ (_John P. Simpson_, President) Amicus Curiae.

**OPINION**

**BARZILAY, JUDGE:**

## I. INTRODUCTION

This case is one of first impression for two important issues. First, the court is asked to determine the scope of its jurisdiction under 28 U.S.C. § 1581(h)(1994), review of pre-importation rulings. Second, the court is asked to interpret the application of the 60 day grace period provided by 19 U.S.C. § 1625(c)(1999) to an importer when a ruling by the United States Customs Service ("Customs") changes the tariff treatment of imported merchandise.

The court has before it a motion for Entry of Judgment on behalf of Heartland By-Products, Inc. ("Heartland"). *See Mem. of Points and Authorities in Supp. of Pl.'s Mot. for Entry of J.* (December 13, 2001) ("Pl.'s Br."). This motion comes as a consequence of the disposition by the Court of Appeals for the Federal Circuit of an earlier decision by this court. *Heartland By-Products, Inc. v. United States*, 264 F.3d 1126 (Fed. Cir. 2001). The original complaint challenged a revocation ruling by the Customs Service which would have increased the tariff duty owed on Heartland's primary import 10,000 percent. *Revocation of Ruling Letter & Treatment Relating to Tariff Classification of Certain Sugar Syrups*, 33 Cust. Bull. No. 35/36 at 41 (Sept. 8, 1999)("Revocation"). This court considered the original case on an expedited basis and held the Revocation contrary to law. *Heartland By-Products, Inc. v. United States*, 23 C.I.T. 754, 74 F. Supp. 2d 1324 (1999). That decision was reversed by the Court of Appeals for the Federal Circuit after a two year interval.

In the meantime, Plaintiff imported thousands of entries relying on this court's decision. The Customs Service liquidated those entries, in some cases prior to the date the appeals court

announced its decision. *Pl.'s Br.* at 1. In response to Customs' actions, Plaintiff filed protests with Customs and asked this court to enter a judgment, pursuant to 19 U.S.C. § 1625(c), specifying the time of application for the higher duty rate to be 60 days after the decision of the Court of Appeals became final. Plaintiff also challenges Customs' authority to liquidate entries at the higher duty rate prior to the time when the Federal Circuit issued its mandate. Defendant responds that the court lacks jurisdiction over liquidation of the entries because the original case was brought under 28 U.S.C. § 1581(h) which is limited to pre-importation review. Defendant also claims that the 60 day notice period provided by 19 U.S.C. § 1625(c) expired in 1999.

The court finds that 28 U.S.C. § 1581(h) does confer subject matter jurisdiction on this court to consider issues applicable to actual entries, which were the contemplated entries considered when the court first took jurisdiction. The court, however, declines to exercise this jurisdiction at this point, to permit issues of fact to be resolved at the administrative level regarding the status of the entries, the rates of final liquidation and whether the Customs Service properly extended any of the entries. In addition, deferring adjudication of the application of 19 U.S.C. § 1625(c) will allow the court to consider the full scope of relief requested by Plaintiff.


## II. PROCEDURAL HISTORY

The Plaintiff is a sugar refiner that imports sugar syrup from Canada and refines the syrup into liquid sucrose. Prior to beginning business operations, Heartland sought an advance ruling from Customs to determine the imported product's classification and duty rate under the Harmonized Tariff Schedule of the United States ("HSTUS"). *New York Ruling Letter* 810328. Based upon this ruling Heartland, in 1997, began importing the syrup into the United States for

refining.

Customs Headquarters published a notice of proposed revocation of the *New York Ruling Letter* in *Customs Bulletin* Volume 33, No. 22/23 dated June 9, 1999, after domestic trade associations, the United States Cane Sugar Refiners' Association, the United States Beet Sugar Association and their member companies filed a petition under 19 U.S.C. § 1516 and/or 19 U.S.C. § 1625 seeking reclassification of Heartland's sugar product. *Heartland*, 74 F. Supp. 2d at 1328. On September 8, 1999, Customs issued a final notice revoking the *New York Ruling*. In the absence of any other action the Revocation would have taken effect November 8, 1999, under 19 U.S.C. § 1625(c), which provides that, "[t]he final ruling or decision shall become effective 60 days after its date of publication."[1]

In light of the 60 day effective date this court heard Heartland's challenge to the Revocation on an expedited schedule. The court took jurisdiction under 28 U.S.C. § 1581(h), which allows for actions to be heard prior to importation of the goods involved only if, "the party

---

[1]The full text of 19 U.S.C. § 1625(c) reads:

(c) **Modification and revocation**
  A proposed interpretive ruling or decision which would--
> (1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or
> (2) have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;

shall be published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision. After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.

commencing the civil action demonstrates to the court that he would be irreparably harmed

unless given an opportunity to obtain judicial review." On October 19, 1999, this court issued an

opinion and order finding the Revocation to be contrary to law. Because the court was able to

reach a decision before the 60 day time limit elapsed, any application of the Revocation was

prohibited. No preliminary injunction was necessary to limit Customs' behavior, because the

court's decision resting on § 1581(h) jurisdiction applied to all prospective entries contemplated

by the ruling. These two factors, the expedited review and jurisdiction under § 1581(h), frame

the issues currently before the court.[2]

On August 30, 2001, the Court of Appeals for the Federal Circuit issued a decision

reversing this court's decision. On December 11, 2001, the Federal Circuit issued its mandate

formally relinquishing it of jurisdiction of the case and returning jurisdiction to this court for any

further action, including entry of judgment. At some point between the announcement of the

decision and the mandate, Customs commenced to liquidate or reliquidate entries, liquidation of

which may have been extended pending conclusion of judicial consideration.[3] Under normal

circumstances entry of judgment by this court is a routine ministerial act; however, Plaintiff has

---

[2]The full text of 28 U.S.C. § 1581(h) reads:

        (h) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.

[3]Whether the entries at issue in this motion were properly extended is not certain. *See Oral Arg. Tr.* at 8, 36.

raised two serious questions. First, after the revocation ruling was upheld by the Federal Circuit at what point may Customs apply the higher rate of duty? Second, may Customs begin liquidating entries before this court issues an entry of judgment upon receipt of the Federal Circuit mandate?

### III.  DISCUSSION

Plaintiff makes several appeals for relief with its motion for entry of judgment. The essential point to all of the claims is that any application of the Revocation must apply to entries, not liquidations, made sometime after December 11, 2001, when the appeal decision became final. Specifically, Heartland argues:

1) 19 U.S.C. § 1625(c) expressly requires that importers be provided with 60 days advance notice of change to any interpretive ruling that has been in effect for 60 days or more.

2) That it is improper to apply the upheld Revocation retroactively to entries imported after publication of the Revocation, but prior to the Federal Circuit's decision.

3) This court can delay the effective date of the Revocation by a reasonable period even in the absence of a statute requiring a notice period.

4) Retroactive application of the Revocation to Heartland is prevented by Customs' regulations.

5) The court should supplement the 60 day notice period with an additional period of time, so as to restore Heartland to a position it would have had absent Customs' acting prematurely.

Defendant contends that the court cannot rule on the questions presented by Plaintiff for three jurisdictional reasons. First, Defendant claims that, because the original case was brought under 28 U.S.C. § 1581(h), there are no "designated entries which were before this Court" and

that subsection (h) is applicable only to "prospective entries." *Def.'s Opp. to Pl.'s Mot. for Entry of J.* at 11 (January 7, 2002) ("Def.'s Br."). Second, consideration of the § 1625(c) issue is beyond the scope of the mandate. *Id*. at 16. Third, Defendant claims that for the Plaintiff to sustain its claim of improper liquidation it must re-establish jurisdiction under § 1581(h) or (i). *Id*. at 9. Defendant contends the facts could not support that jurisdiction, therefore, the case must be dismissed to be brought under § 1581(a), after a protest has been filed by the importer and denied by Customs.

The court begins its analysis with Defendant's first point directly relating to the specific jurisdiction of this court under § 1581(h). The court rests its analysis on the history of § 1581(h) and its context within general federal law and customs law, and concludes that it does confer jurisdiction on this court to adjudicate entries that come before it pursuant to § 1581(h). To do otherwise would render subsection (h) meaningless as an avenue of relief (*See* 28 U.S.C. § 2643(c)(1)) and unconstitutional as an advisory opinion. The jurisdictional analysis distills into three questions. Who and what are subject to the court's jurisdiction in this matter, and how long does that jurisdiction last?

A. <u>What is properly before this court?</u>

To understand the scope and authority conferred on this court by § 1581(h) it is necessary to place it in context. This context includes the Customs Courts Act of 1980 ("1980 Act"), which for the first time provided for declaratory judgment power by the Court of International Trade, the history of declaratory judgments in American law and the long-standing rules of Customs law in the United States. *See* Pub. L. No. 96-417, 94 Stat. 1727 (1980).

**1980 Act**:   The United States Customs Court formerly constituted under Article I became an

Article III court in 1956.  28 U.S.C. § 251.  However, even after 1956 the court remained limited

in its remedial power and scope of jurisdiction relative to general jurisdiction district courts.  The

1980 Act instituted dramatic changes in the power and procedures of the court, and reflecting

such, changed the name from the United States Customs Court to the United States Court of

International Trade. Prior to 1980, the court's lack of full remedial powers often created

jurisdictional nightmares, where Plaintiffs could not have their case adequately considered by any

single court, and so found themselves without an adequate remedy before the Customs Court and

without the right to adjudicate before general jurisdiction district courts.  The House Report to

the 1980 Act discussed the problem at length.

> With the growth in international trade, the number of suits in the district courts and subsequent dismissals for want of jurisdiction have increased. Congress is greatly concerned that numerous individuals and firms, who believe they possess real grievances, are expending significant amounts of time and money in a futile effort to obtain judicial review of the merits of their case.
> H.R.7540 corrects these inequities by revising the statutes to clarify the present status, jurisdiction and powers of the Customs Court. The Customs Courts Act of 1980 creates a comprehensive system of judicial review of civil actions arising from import transactions, utilizing the specialized expertise of the United States Customs Court and the United States Court of Customs and Patent Appeals. This comprehensive system will ensure greater efficiency in judicial resources and uniformity in the judicial decision making process.
> The bill also assures aggrieved parties better access to judicial review of a civil action arising out of an import transaction. Such access is not presently assured due to jurisdictional conflicts caused by the ill-defined division of jurisdiction between the Customs Court and the federal district courts. Most importantly, H.R. 7540 perfects the status of the Customs Court by providing it with all the necessary remedial powers in law and equity possessed by other federal courts established under article III of the Constitution.

H. Report No. 1235, 96th Cong., 2d Session,  at 19-20 (1980), *reprinted in* 1980 U.S.C.C.A.N.

3729, 3731.

The 1980 Act was a fundamental change in the judiciary's relationship to Customs law.[4]

"The Act clarified and expanded the jurisdiction of the United States Customs Court from both a

substantive and remedial standpoint." *Litigation Before the United States Court of International*

*Trade*, Hon. Edward D. Re,  Preface to Title 19 U.S.C.A. p. XXV. The first listed goal of the

1980 Act was to provide an "explicit grant of all judicial powers in law and equity to the Court of

International Trade . . .thereby completing the full transformation of the Customs Court to an

article III court." 1980 U.S.C.C.A.N. at 3739.

To provide a framework for this new power, Congress amended the statutes that govern

the jurisdiction and powers of the court. *See e.g.,* 28 U.S.C. §§ 1581, 1582, 1583, 2643.

Traditionally, the Customs Court was unable to consider any claim before all administrative

remedies were exhausted.  In addition, it could not issue injunctions, writs of mandamus or other

---

[4] The dramatic change from the traditionally limited nature of the Customs Court is seen in other sections of the legislative history, for instance the effect of remand authority:

> Subsection (b) is a new provision that empowers the Court of International Trade to remand the civil action before it for further judicial or administrative proceedings. In granting this remand power to the court, the committee intends that the remand power be co-extensive with that of a federal district court. In addition, this subsection authorizes the court to order a retrial or rehearing to permit the parties to introduce additional evidence.
> Subsection (b) has particular impact on civil actions brought pursuant to section 515 or 516 of the Tariff Act of 1930. Under existing law, for example, in a civil action commenced under the court's jurisdiction to entertain cases involving the classification or valuation of merchandise, if the plaintiff succeeds in demonstrating that the original decision of the customs service was incorrect but is unable to establish the correct classification or valuation, the court dismisses the civil action. In effect, the court holds in favor of the United States even though the plaintiff has demonstrated that the challenged decision of the Customs Service was erroneous. Subsection (b) would permit the court in this situation to remand the matter to the Customs Service to make the correct decision or to schedule a retrial or rehearing so that the parties may introduce additional evidence.

1980 U.S.C.C.A.N. at 3772.

equitable remedies.  28 U.S.C. § 2643(c)(i) issued a broad grant of power to the Court of

International Trade, specifying that in addition to money judgments, the court has the power to

"order any other form of relief that is appropriate in a civil action, including, but not limited to

declaratory judgments, orders of remand, injunctions and writs of mandamus and prohibition."

Paragraph (4) of § 2643(c), restricted this broad grant. "In any civil action described in section

1581(h) of this title, the Court of International Trade may only order the appropriate declaratory

relief."

Section 1581(h) is an extraordinary instrument, and a significant exception to the

procedural requirements traditionally placed on those challenging a decision by Customs.

Historically, in order to challenge a decision like the Revocation at issue in this case, it was

necessary for a party to exhaust remedies available through the administrative agency by filing a

protest with Customs.  *See Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547,1551 (Fed. Cir.

1988).  Exhaustion in such a case also requires plaintiffs to pay any duties owed on the entries in

question before filing with this court.  *See Am. Air Parcel Forwarding Co., Ltd. v. U.S.,* 6 C.I.T.

146, 150, 573 F.Supp. 117,120 (1983), *aff'd* 718 F.2d 1546 (Fed. Cir. 1983).  Section 1581(h)

allows for bypassing these procedural and monetary burdens in specific and narrow

circumstances, namely, if the importer can demonstrate that it "would be irreparably harmed

unless given an opportunity to obtain judicial review prior to [an] importation."[5]  In such cases

---

[5] That Congress understood the burden and explicitly wanted to spare a narrow class of plaintiffs the hardship of exhaustion of remedies is clear in the House Report specifying the exceptions including those,

> in a civil action, pursuant to proposed section 1581(h), to contest a ruling by the Secretary of the Treasury, or the refusal by the Secretary to issue or change a ruling be

the court may exercise jurisdiction; however, as noted above, its remedial power is limited to that of  declaratory judgment.

In *Pagoda Trading Co. v. United States*, Judge Watson provided background as to the purpose and scope of § 1581(h).  6 C.I.T. 296, 577 F.Supp. 22 (1983).

> The cause of action under § 1581(h) was not created to allow judicial review of general interpretative rulings issued by the Secretary of Treasury whenever there is a likelihood of an effect on importations.  The Court reads the language of the law as speaking to rulings which determine the fate of specific importations of specific goods.  The Court also reads the legislative history as speaking to specific contemplated import transactions which contain identifiable merchandise and which will feel the impact of the ruling with virtual certainty.

*Id.* 577 F.Supp. at 24 (citations omitted).

In this context it is clear that Congress intended § 1581(h) to apply in a limited number of cases.  Section 1581(a), which provides for appeal following a denied protest was, and remains, the preferred route to this court for classification contests.  Subsection (h) comes into play only when the traditional route will inflict irreparable harm on a plaintiff, and when the case is concrete enough that any decision will be ripe for review.  The legislative history also makes clear that Congress did not intend for subsection (h) to replace jurisdiction under (a), and, therefore, limited the scope of relief under (h) to declaratory judgment, explicitly precluding

---

commenced prior to exhaustion of one's administrative remedies. The court is authorized to permit this exception if the party commencing the action can demonstrate that he would be irreparably harmed if forced to exhaust his administrative remedies in following the traditional route prior to judicially challenging the Secretary's ruling or lack thereof.
    The Committee believes this provision is essential in light of the grant of jurisdiction under proposed section 1581(h). Without this exception to the exhaustion rule, proposed section 1581(h) would well be rendered meaningless.

1980 U.S.C.C.A.N. at 3769.

injunctive relief.

> Subsection (c)(4) is the third exception to the general grant of remedial powers found in subsection (c)(1). Under this provision, the Court of International Trade may only grant declaratory relief in a civil action commenced under proposed section 1581(h) to review a ruling by the Secretary of the Treasury or the refusal by the Secretary to issue or change a ruling. It is the Committee's belief that declaratory relief is the appropriate remedy for this type of action. To permit injunctive relief would encourage persons to bring suit under proposed section 1581(h) rather than pursuing traditional methods of challenging the secretary's ruling or a lack thereof. As such, the Committee feared that the exception would become the rule and did [not] intend to create such a major shift in trade policy.

1980 U.S.C.C.A.N. at 3773, with correction noted at 126 Cong. Rec. 26555 (1980), (statement of

Rep. Rodino).

**Declaratory Judgments in American Law**:  Declaratory relief is of relatively recent vintage in

federal law.  It was not until 1937, after the passage of the Declaratory Judgment Act (28 U.S.C.

§ 2201), that the Supreme Court decided it was permissible for a statute to confer declaratory

judgment jurisdiction on the judiciary.  *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937).

The Court was careful to state that it would grant, "specific relief through a decree of a

conclusive character, as distinguished from an opinion advising what the law would be upon a

hypothetical state of facts." *Id*. at 241.  While the Court recognized the new power, it was careful

to point to constitutional limitations that would need to be heeded.

> We have thus recognized the potential for declaratory judgment suits to fall outside the constitutional definition of a "case" in Article III: a claim "brought before the court(s) for determination by such regular proceedings as are established by law or custom for the protection or enforcement of rights, or the prevention, redress or punishment of wrongs."

*Calderon v. Ashmus*, 523 U.S. 740, 746 (1998) (quoting *Fairchild v. Hughes*, 258 U.S. 126, 129 (1922). The threshold test for when a dispute becomes a 'case' under Article III, is when it is found to be an actual controversy. In *Maryland Casualty Co., v. Pacific Coal & Oil Co.*, the Supreme Court stated that the difference between an abstract question and a controversy under the Declaratory Judgment Act is one of degree.

> Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

312 U.S. 270, 273 (1941) (citations omitted).

In *Calderon*, the Supreme Court was even more specific as to the kinds of actions that do not satisfy the actual controversy test of adverse parties, a real dispute of an immediate nature and eligibility for conclusive relief. There, the Court denied the plaintiff the ability to seek a "declaratory judgment to litigate a single issue in a dispute that must await another lawsuit for complete resolution." 523 U.S. at 748. The Court in *Calderon* looked for guidance to an earlier patent case, *Coffman v. Breeze. See Calderon*, 523 U.S. at 746 *citing* 323 U.S. 316 (1945). In *Coffman,* a patent holder requested the Court to declare the Royalty Adjustment Act unconstitutional and to enjoin his licensee from paying accrued royalties to the government. However, the constitutionality of the act would arise as an issue only if the patent holder sued to recover the royalties, and the licensee raised the act as an affirmative defense. The Court held there was no justiciable question until the patent holder sued, and the licensee actually raised the

affirmative defense. *Coffman*, 323 U.S. at 324.[6]

The foregoing indicates that when Congress conferred the power to issue declaratory judgments on this court it was not an empty exercise. It was a jurisdictional grant with real effect and clear caselaw governing its use.[7] Congress also was clear that if it did grant this authority to the court it did not want it to be meaningless, despite its narrow application.

**Customs Law Jurisprudence**: Invocations of § 1581(h) by this court subsequent to the passage of the 1980 Act confirmed a narrow but binding use of jurisdiction under the subsection, consistent with the legislative history and declaratory judgment caselaw.[8] However, like other provisions in the law that grant declaratory relief, subsection (h) must hew to a fine distinction between when a case is specific enough to be considered an actual case for judicial review, and when it is still not concrete enough to settle an actual dispute between adverse parties. In order

---

[6]Related to the issue of actual controversy is a prudential notion of ripeness, which often turns on similar facts and questions. *See e.g., Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967).

[7]*Black's Law Dictionary* defines Declaratory Judgment as the following: Statutory remedy for the determination of a justiciable controversy where the plaintiff is in doubt as to his legal rights. A binding adjudication of the rights and status of litigants even though no consequential relief is awarded. Such judgment is conclusive in a subsequent action between the parties as to the matters declared and, in accordance with the usual rules of issue preclusion, as to any issues actually litigated and determined. *Black's Law Dictionary* 409 (6th ed. 1990) (parenthetical references and citations omitted).

[8] *See e.g., Pagoda Trading Co.*, 577 F.Supp. at 24 (jurisdiction can be invoked only when ruling is specific as to merchandise plaintiff intends to import); *Am. Air Parcel Forwarding*, 557 F. Supp. at 608 (jurisdiction is not available for "internal advice" ruling as it related to product already imported); *Nat'l Juice Products Ass'n. v. United States*, 10 CIT 48, 628 F. Supp. 978 (1986) (country of origin ruling could be challenged under § 1581(h) when plaintiffs clearly intended to produce and import product described in the ruling).

to understand the scope and power conferred on this court by § 1581(h), another factor must be added that provides context to the case at bar.  The fundamental shift in the power of this court initiated by the 1980 Act, and the real and extraordinary authority to issue declaratory judgments recognized in *Aetna,* must be weighed against a history of customs law practice dating back to the beginning of this nation.  The issue can be summarized by analysis of the following sentence from Defendant's brief:

> Because this action considers only the basis and merits of the revocation ruling for pre-importation and does not encompass any entries, the CIT cannot rightfully rule on Heartland's motion.

*Def.'s Br.* at 4, n. 4.  It is the nature of this court's practice that, with few exceptions, the authority to rule on a decision by the Customs Service will be invoked only once a product has entered the United States.  This is not a coincidence of statutory construction.  It is a product of years of Customs decisions, most of which pre-date this court's transition to an Article III court.

The touchstone case, from 1927,  illustrates how the judiciary has treated Customs cases differently from other civil actions.  In *United States v. Stone & Downer Co.*, the Supreme Court held that a prior judgment determining the classification of goods and the duty upon their importation was not "res judicata" (in this case meaning the modern day collateral estoppel or issue preclusion) upon another importation of the same kind of goods by the same importer.  274 U.S. 225 (1927).  The court's exception to this application of estoppel was note-worthy not only because it distinguished classification cases from other civil actions, but even from other revenue cases brought against the government, such as tax cases.  *See e.g., C.I.R. v. Sunnen*, 333 U.S. 591 (1948).

*Stone & Downer* provides the strongest precedent that each new entry is a new cause of action. *See e.g., Boltex Mfg. Co., L.P., v. United States,* 24 CIT __, __, 140 F. Supp. 2d 1339, 1346 (2000). This principle underlies the government's position in this case that § 1581(h) does not provide jurisdiction to cover entries imported after this court's decision because there were no entries before the court in the original adjudication. Even if there were, the government would argue, each entry would be a new cause of action, beyond the scope of the current Heartland case.[9] Before the court recognizes such a broad reading of this precedent, which would undermine Congress' intent as to § 1581(h), it must examine the rationale behind the *Stone & Downer* case and the significant subsequent narrowing of the principle by statute and caselaw.

*Stone & Downer* involved importations of wool fleece and yarn. 274 U.S. at 229. A similar case between the same parties with similar merchandise had been decided in the government's favor. *Id.* The question before the Supreme Court was the res judicata effect of the previous ruling. The Court held that in classification cases there would not be res judicata. The Court relied on two rationales. First, the Court granted deference to the rule established by the Court of Customs Appeals (predecessor to the Court of Appeals for the Federal Circuit) when

---

[9] A different reading of Defendant's term "not before the court" could be that in Customs cases the court is essentially acting in rem, and unless it has jurisdiction over some physical property it cannot exercise jurisdiction. Yet this concept does not have any specific caselaw to support it, is contrary to the court's use of equity power in other cases and would make § 1581(h) absolutely meaningless. *See e.g., Queen's Flowers de Colombia, v. United States*, 20 CIT 1122, 947 F. Supp. 503 (1996)(enjoining collection of antidumping duty deposits at importation for certain entries to be imported in the future). Therefore, the court will focus its attention on the argument that each entry is its own cause of action, and, therefore, entries dated after the court's decision of October 19, 1999 are not before the court because they are new causes of action.

that court was the final appellate body on customs matters.  Second, the Court found wisdom in

the rule itself:

> The business of importing is carried on by large houses between whom and the
> government there are innumerable transactions as here, for instance, in the
> enormous importations of wool, and there are constant differences as to the proper
> classifications of similar importations.  The evidence which may be presented in
> one case may be much varied in the next.

*Id.* 274 U.S. 235-36.  The Court was concerned that a decision would create binding law between

one house and Customs that would be applied to another house, without giving the second house

a chance to litigate any distinguishing elements.  Therefore, the Court limited the broader rule of

collateral estoppel in customs cases.  "There of course should be an end of litigation as well in

customs matters as in other tax cases, but circumstances justify limiting the finality of the

conclusion in customs controversies to the identical importation."  *Id* at 235.  Subsequent cases

expanded the use of collateral estoppel in tax revenue cases, but not in customs revenue cases.

*See e.g., United States v. De Messimy,* 16 U.S. Cust. Appls. 150, 152 T.D. 42781 (1928).[10]  The

---

[10]Collateral estoppel is the more specific term for binding parties to a determination
essential to a previous case that the party was able to litigate on the merits.  It is a species of the
larger category of principles embodied in the phrase res judicata.  Opinions of several decades
ago, however, simply use the broad term "res judicata." Over time they have been given specific
meanings.  The Restatement of Judgments 2d equates the term res judicata to claim preclusion,
and collateral estoppel to issue preclusion. The linguistic change is noted in Kenneth C. Davis,
*Administrative Law of the Eighties: 1989 Supplement to Administrative Law Treatise*, § 21:8 at
408, (1989):

> The Court said in *Mendoza*, 464 U.S. at 158: "Under the judicially developed doctrine of
> collateral estoppel, once a court has decided an issue of fact or law necessary to its
> judgment, that decision is conclusive in a subsequent suit based on a different cause of
> action involving a party to the prior litigation. . . .  Collateral estoppel, like the related
> doctrine of res judicata, serves to relieve parties of the cost and vexation of multiple
> lawsuits, conserve judicial resources, and, by preventing inconsistent decisions,
> encourages reliance on adjudication."  Then the Court said in footnote 3: "Under res

courts did apply res judicata (modern claim preclusion) principles to cases which involved the

same cause of action as in a prior suit.  In such cases the courts equated cause of action with

entries, and claims decided in previous cases involving the same entries could not be re-litigated.

*See e.g., United States v. Edward M. Poons Co. of Kobe Inc*., 18 C.C.P.A. 283 (1930).

*J.E. Bernard & Co., Inc. v. United States* further constrained the impact of the exception

to collateral estoppel in Customs cases.  66 Cust. Ct. 545, 324 F. Supp. 496 (1971).  *Bernard* was

an appeal for reappraisement in a valuation case.  Judge Maletz, after recounting in greater detail

the history of collateral estoppel outlined above, distinguished *Stone & Downer* from *Bernard*,

pointing out that *Stone & Downer* was a classification case, and *Bernard* a valuation case.  The

court thereby limited the reach of *Stone & Downer's* exception to collateral estoppel:

> [C]ollateral estoppel is applicable in reappraisement litigation. . . .[in these cases]
> the name of the nominal plaintiffs, the parties are the same, the cases involve
> identical merchandise, the same purchase price, the same exporter and importer,
> and arise out of the same contract of sale.  The only distinction between the two
> cases is that different importations are involved and, therefore, two causes of
> action.

324 F. Supp. at 502-3.  The court then explains the impact of applying collateral estoppel.  "In

short, given the circumstances here, collateral estoppel requires that the prior judgment be

conclusive."  *Id.* at 503.

Therefore, in this case when Defendant invokes the phrase "no entries before the court" it

must be seen as a shorthand for judicial rules that governed Customs practice prior to the 1980

---

judicata, a final judgment on the merits bars further claims by parties or their privies on
the same cause of action. . . .  The Restatement of Judgments speaks of res judicata as
'claim preclusion' and of collateral estoppel as 'issue preclusion.' (Citing *United States v.
Mendoza,* 464 U.S. 165 (1984)).

Act. It also is clear that, contrary to the government's assertion, the rule that each new entry is a new cause of action does not apply in all Customs cases. Instead it is limited to classification cases where the new entries differ such that Customs cannot rely on previous rulings to deny an importer the opportunity to raise new facts. This principle is not a broad jurisdictional limitation of the court's power in Customs cases, so that it requires the court to have jurisdiction over specific entries before it can rule on matters concerning those entries. It is simply a specific exception to traditional rules of res judicata in certain classification decisions. *Bernard* established that in valuation cases Customs is bound by this court's decisions even as to entries that are prospective. Since *Bernard*, and the 1980 Act, the court has found collateral estoppel applicable in classification cases where a plaintiff sought to apply collateral estoppel against Customs, when Customs applied regulations governing classification of goods deemed invalid by this court. *See Gulfstream Aerospace Corp. v. United States,* 21 CIT 1038, 981 F.Supp. 654 (1997).

In addition to the collateral estoppel cases, the court has consistently applied the principle of stare decisis to previously litigated legal issues, even in classification cases. Under stare decisis courts refuse to examine legal issues previously decided in another case. In *Schott Optical Glass, Inc. v. United States,* the Federal Circuit confirmed the validity of stare decisis as applied in a classification case, as well as the exception that a party can challenge a previous decision if it is clearly erroneous. 750 F. 2d 62, 64 (1984). When read together with the collateral estoppel cases, *Schott Optical Glass* establishes that decisions of this court are binding on Customs, and the contention that every new entry is a new cause of action is narrowly applied.

Defendant makes an additional argument about the scope of the court's power under

§ 1581(h) and the lack of entries before the court, that "judicial review is available only for prospective transactions." *Def.'s Br.* at 10. Defendant buttresses its point by citing to the legislative history that states subsection (h) covers "contemplated transactions" and a case where § 1581(h) was not available because the goods had already been imported. *Id.* at 11 (citing 1980 U.S.C.C.A.N. 3729, 3758; *Dennison Mfg. Co. v. United States*, 12 CIT 1,3, 678 F. Supp. 894, 897 (1988). Defendant contends the normal protest and denial process under § 1581(a) is the only avenue to relief, because "there were no specific, designated entries before this Court." *Def.'s Br.* at 11. In essence the government contends § 1581(h) jurisdiction lasts only as long as no product is imported, and expires once any importation takes place.

Having placed § 1581(h) in the appropriate context, the court can now directly address the question of what did the court have jurisdiction over when it took the case in 1999. The government argues that subsection (h) only covers prospective entries, and therefore can never apply to an actual entry, even when the actual entry was the prospective entry contemplated by the court when it took jurisdiction of the case, and by the ruling that was the subject of Plaintiff's complaint.

**The Scope of § 1581(h)**: The government is attempting to make a semantic (nearly metaphysical) argument that when the court takes jurisdiction under § 1581(h) the power of that decision lasts only as long as the entries remain prospective. As soon as a prospective entry becomes an actual entry by importation of the goods into the United States, the court's power ends. This cannot be true if the court's jurisdiction under § 1581(h) is to have any meaning or

effect. The history of the 1980 Act and the history of declaratory judgments lead to the certain conclusion that any judgment by this court under § 1581(h) must resolve a real legal issue between adverse parties, and must be applicable to future actual entries (as opposed to present hypothetical entries). The statutory and caselaw does not say differently, and to the degree it does, it is overruled by the 1980 Act.

The government's argument has conflated the timeline for litigation. While the jurisdictional predicate for § 1581(h) requires that the entries be prospective, this must be distinguished from the effect of a judicial decision which can only be useful if it is applied to real entries. The entire rationale for pre-importation review under § 1581(h) is that Customs will be bound to apply the court's decision on the adjudicated ruling to future entries. Defendants argue that because subsection (h) is for settling legal issues prior to importation, the result of that judicial inquiry cannot apply to those importations once they enter the country. Not only is this illogical, it is contrary to the clear intent of the statute. It is also potentially unconstitutional. Accepting Defendant's argument would render § 1581(h) unconstitutional as calling for the court to issue merely an advisory opinion in a matter not a case or controversy as discussed *supra*.

The judiciary's struggle to balance the use of declaratory judgment with the constitutional mandate that it hear only actual cases or controversies indicates that the 1980 Act did not, and could not, limit the reach of a judicial decision under § 1581(h) only to rulings, but never to actual entries. In order for a case to qualify as an actual case, and not an advisory opinion, it must involve a true legal issue between opposing parties and have the ability to render conclusive relief within the case at issue. It cannot be used to settle a legal issue merely for advantage in a separate cause of action. *See e.g., Calderon*, 523 U.S. at 747.

With § 1581(h) Congress created an exception to the usual requirements that administrative remedies must be exhausted, and any duties owed be paid prior to seeking relief. Consistent with the constitutional requirements of declaratory judgment jurisprudence, the exception is available only when plaintiffs show irreparable harm in cases "which determine the fate of specific importations of specific goods." *Pagoda Trading Co.,* 577 F. Supp. at 24. It speaks "to specific contemplated import transactions which contain identifiable merchandise and which will feel the impact of the ruling with virtual certainty." *Id.*

When this court took jurisdiction under § 1581(h) in the original *Heartland* decision, it had the power to issue a legally binding decision. That decision would determine the correctness of the Revocation. The decision was not merely advisory, it had practical, concrete application. In this case, it was applicable to the Revocation and to all entries contemplated by the Revocation and at issue in the litigation. In such cases it is not the court that frames the issue and designates entries at stake. It is the importer that requests an advance ruling and Customs that determines how broad the ruling will be. The traditional rule that each entry is a new cause of action does not obtain in the case where the initial cause of action encompasses prospective entries. To force an importer to seek relief under § 1581(h) to establish its rights, and then force it to litigate again when it seeks to enforce those rights with actual entries, would make § 1581(h) superfluous as an avenue of relief. It is also contrary to the requirements for a valid declaratory judgment case under the Supreme Court's decision in *Calderon.*

Having established that decisions of this court grounded in the jurisdiction of § 1581(h) can have binding application to subsequent entries, the next issue is to determine which parties are bound, and for how long.

B.      Who is bound by the decision?

Under normal circumstances it is not necessary to inform parties to cases that they are

bound by the decision of the court.  However, implicit in the Government's brief is the idea that

Customs law, and therefore the Customs Service, is subject to distinct laws and rules, which

render normal litigation practice inapplicable.  To some extent this is true.  In certain

circumstances it is possible for the Customs Service to limit (but not abrogate) a decision of this

court.  *See Boltex v. United States,* 140 F. Supp. 2d at 1346; 19 C.F.R. § 177.10(d) (1998).

However, this is not a wholesale waiver, but an exception.  Once the judiciary has spoken to a

law, in the absence of congressional action, parties to the dispute are bound by the court's

decision.[11]  The fact that one of the parties to this litigation is the government does not exempt it

---

[11]The issue of agency non-acquiescence has surfaced before.  For example, in the first half of the 1980's the Social Security Administration refused to acquiesce to district and circuit court opinions.  Often an agency will apply certain court decisions only within the circuit that issues them. *See* Samuel Estreicher and Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 Yale L.J. 679 (1989). Obviously, circuit specific rulings are not applicable in Customs cases because the CIT is a court of national jurisdiction.  A federal district court addressing the issue stated the following:

> Our system of constitutional government is undoubtedly a unique and complex one, with three distinct branches of government with independently derived legal authority and substantially separate functions--the legislature, to enact the law; the judiciary, to interpret the law; and the executive (and its administrative agencies), to enforce the law. Undoubtedly, too, the lines of separation between these functions are not always clear-cut. The judiciary necessarily exercises enforcement-related functions as an incident of its interpretive and adjudicative activities, while the executive, particularly in the modern era of elaborate administrative agency regulation of a multitude of commercial, social, economic, scientific and employment-related affairs, is permitted to exercise a degree of interpretive authority in its enforcement of the law. However, only a fundamental reordering of this constitutional balance would permit the [Social Security Administration] to exercise the power to which it claims an entitlement in this case. The fundamental principles of our constitutional scheme, as articulated in decisions such as *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) (judicial determination of

from complying with the law as interpreted by the judicial branch. It is the purpose of this court to adjudicate and settle disputes between private individuals and our government. Having waived sovereign immunity, the government is bound the judiciary branch's decisions. While there are exceptions to this rule, none of them are present in this case. The government was bound by the original unstayed *Heartland* decision of this court, as much as Heartland is bound by the Federal Circuit's reversal.

C.      How Long are the Parties Bound?

The Rules of the U.S. Court of International Trade provide for a party to stay the execution of a decision pending appeal. USCIT R.62. In fact, there is a specific rule exempting the United States from posting a bond when it is the appellant. *See* USCIT R.62(d). In the absence of a request by one of the parties the decision of the court is binding.[12] As explained by

constitutionality of congressional legislation), *Cooper v. Aaron*, 358 U.S. 1, 17-19, 78 S.Ct. 1401, 1409-10, 3 L.Ed.2d 5, 19 (1958) (state executive and legislative officials' duty to obey federal court decisions), and *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (judicial determination of scope of presidential power), *establish the authority of federal courts to render decisions which bind all other participants in our constitutional system of government.*

*Stieberger v. Heckler*, 615 F.Supp. 1315, 1356-57 (S.D.N.Y. 1985) (emphasis added) *rev'd on other grounds*, *Stieberger v. Bowen*, 801 F.2d 29 (2d Cir. 1986)).

[12] Requesting a stay is not the only option open to Customs in the face of an adverse ruling. Any product falling under the Revocation could be subject to at least three actions by Customs. First, Customs could apply the pre-Revocation rate, consistent with the decision of this Court. Second, under 19 U.S.C. § 1504(b) and (c), Customs could extend liquidation pending the outcome of the appeals process, making clear its intent to apply the Revocation if it is upheld by the Federal Circuit. Third, Customs could flout the decision of this court, liquidate the entries and risk punitive action by this court. It is unclear, but, at least until August 30, 2001, Customs

the Court of Appeals for the District of Columbia in another case involving review of agency

action,

> the vitality of that judgment is undiminished by pendency of the appeal. Unless a
> stay is granted either by the court rendering the judgment or by the court to which
> the appeal is taken, the judgment remains operative. To be sure, for as long as the
> appellate court retains its mandate it maintains jurisdiction over the case, and thus
> the power to alter the mandate. But non-issuance of the mandate by the appellate
> court has no impact on the trial court's powers to enforce its unstayed judgment
> since the latter court has retained that power throughout the pendency of the
> appeal.

*Deering Milliken, Inc. v. Fed. Trade Comm'n*, 647 F.2d. 1124, 1129 (D.C. Cir. 1978).

Under the Federal Rules of Appellate Procedure, an opinion of the appeals court is not

final until it issues its mandate. Fed. R. App. P. 41(c). This rule is confirmed in the caselaw.

Even if the appeals court issues a decision without the mandate, it is still open and subject to

change. *See Bryant v. Ford Motor Co.*, 886 F.2d 1526 (9th Cir. 1989) (vacating a prior en banc

opinion in light of new legislation). In some cases the initial decision has been withdrawn and

changed prior to the mandate's issuance. It is important to understand that unless specifically

directed, the parties cannot rely on the decision as final until the mandate issues. *See T.S. Alphin

v. Henson,* 552 F.2d 1033, 1035 (4th Cir. 1977). Once the mandate is issued, the court of appeals

relinquishes jurisdiction over the case back to the trial court for further proceedings consistent

with the mandate. *See e.g., United States v. Cote*, 51 F.3d 178, 181-82 (9th Cir. 1995).

Defendant quotes *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, for the proposition that

---

may have chosen the second option and extended liquidation pending the outcome of the judicial
process. Apparently some entries were given the pre-Revocation rate. It is the actions Customs
took after August 30, 2001 that raise the most serious questions and problems.

"when a judgment for the plaintiff is reversed. . . the only matters that remain for the district court are to dismiss the complaint and enter the judgment in the docket." 137 F.3d 1475, 1483 (Fed. Cir. 1998). The government failed to include the important sentence that immediately precedes the one quoted: "As an initial matter, every appellate court judgment vests jurisdiction in the district court to carry out some further proceedings." *Id.*

In light of the relevant caselaw, the Federal Rules of Appellate Procedure, and the Rules of this court, it is clear the decision of this court remains binding and enforceable until the issuance of the mandate. Any action by Customs that applies the Revocation prior to the issuance of the mandate directly flouts the authority of this court over rulings under § 1581(h). This court's October 1999 decision that the Revocation is contrary to law remains binding on Customs until the issuance of the mandate by the Federal Circuit. Had Customs not acted precipitously with regard to at least some liquidations, thus eliciting Plaintiff's motion, this matter would have concluded at that time.

D.     Application of § 1581(h) and disposition of motion.

In summary, while the Court of International Trade remains one of limited jurisdiction, the 1980 Act fundamentally changed the jurisdictional reach and remedial powers of the court. The legislative and case histories detailed above confirm that § 1581(h) is a significant grant of jurisdiction to the court. It allows for pre-importation review of certain cases, if the requirements for irreparable harm can be shown.

When the court hears a case under § 1581(h), it has the power to issue a binding opinion

that covers the entries contemplated by the ruling at issue. In the absence of "specific contemplated import transactions" which will apply a ruling with "virtual certainty" jurisdiction under § 1581(h) is not available. *See Pagoda Trading Co.*, 577 F. Supp. at 24. Failure of litigants and the court to identify the relevant contemplated import transactions presents the prospect of an unconstitutional advisory opinion, and prudential concerns of ripeness. Once the class of contemplated imports is defined by the importers and Customs, the scope of the jurisdiction the court will exercise is set. Often this class will be defined by the ruling the government issues. A decision reached in an § 1581(h) cases is binding in that case, and a party is not required to file a new case to enforce that decision.

The court's decision binds the parties as long as it remains in place, or a motion is granted to stay the decision. In a routine case when the decision is reversed the original decision is binding until a mandate from the appeals court issues. Even in cases of reversal the district court still retains jurisdiction to settle collateral issues, such as attorney fees. *See White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445 (1982). Nevertheless, with a traditional case, this court relinquishes jurisdiction over parties and issues with entry of judgment following a mandate.

This, however, is not a typical case. The court has extended its jurisdiction well past reception of the mandate to consider the Plaintiff's motion. In addition, Plaintiff is seeking uncommon relief by asking the court to rule on the purpose and meaning of 19 U.S.C. § 1625(c) when that issue was not adjudicated in the original proceeding. Plaintiff's motion requests that the judgment order implementing the mandate of the Federal Circuit specify that the higher Tariff Rate Quota rate applies only to entries following a 60-day notice period after the issuance of the

Federal Circuit's mandate, and perhaps even further to 60 days after this court's disposition of Plaintiff's motion. *Pl.'s Br.* at 2.

At issue are four categories of import entries arranged chronologically: those imported before the Federal Circuit opinion of August 30, 2001, those between August 30 and December 11, 2001, those between December 11, 2001 and disposition of the Plaintiff's motion, and those entered after disposition of the motion. Parallel to the entries are the instances and dates for liquidation, which also can be divided into the four time periods above.

The court clearly has jurisdiction over some of these entries, specifically those entered and liquidated prior to December 11, 2001. It is not at all clear that the court could rule on the application of the higher tariff rate to liquidations, let alone entries, after December 11, 2001. The effective date of the Revocation was not an issue disputed in the original case. It is an issue created by arguably premature Customs' actions against Heartland. Therefore, the court should consider this matter only if necessary to enforce its, or the appellate, decision. There is an obvious link between the restoration of the Revocation by the Federal Circuit, and determining the effective date of its application. Plaintiff, however, has not to date established to the satisfaction of the court a significant nexus between the original decision of this court and its request for relief under § 1625(c) sufficient to warrant the maintenance of extraordinary jurisdiction to grant that relief to all entries Plaintiff claims are at issue in the case.

The court then has the option of ruling on the applicability of § 1625(c) on some of the entries covered by the Plaintiff's motion. However, the court would not be able to consider all the relief the Plaintiff is requesting. In addition, the factual record is not clear. At oral argument

the status of the liquidation process was uncertain. *Oral Arg. Tr*. at 8, 36. If Customs had

properly extended pursuant to its statutory authority under 19 U.S.C. § 1504(b), there would be

no issue with regard to those entries. For the court to maintain jurisdiction to settle the

application of § 1625(c) to new entries, and those with uncertain liquidation status, requires

adjudication of both new law and new facts distinct in nature from the original case. *See* Fed. R.

Civ. P.15; CIT R.15., (providing for supplemental pleadings, allowed at the discretion of the

court); *See also* 28 U.S.C. § 1367 (providing for supplemental jurisdiction by district courts over

all other claims that are so related to claims in the action within such original jurisdiction that

they form part of the same case or controversy.)[13]

The court declines to exercise its jurisdiction under § 1581(h) as there is a better

alternative available in this case. Plaintiff already has filed protests on liquidations by Customs

of entries, some of which occurred while this court's decision of October 19, 1999 was still in

force. Other liquidations occurred after the mandate issued on December 11, 2001. If denied,

these protests will soon be ripe for adjudication under § 1581(a).[14] This allows the court to

consider Plaintiff's claims relating to the 60 day notice provision of § 1625(c) on the more

traditional jurisdictional grounds of § 1581(a).[15] Should the court decide that the 60 day period

---

[13]*See e.g., Ammex, Inc. v. United States*, Slip Op. 02-20 (CIT February 22, 2002) (Motion for order to show cause why defendant should not be held in contempt denied, but noting if Customs attempted to attach or evade a court's judgment, the court could exercise jurisdiction over such behavior under its inherent enforcement powers and as an extension of its jurisdiction to hear a plaintiff's original complaint.)

[14] If Customs grants the protests, Plaintiff will have gained much of the relief it seeks here through the administrative process.

[15] Plaintiff argues that the court could also take jurisdiction under 28 U.S.C. § 1581(i). *Reply Mem. of Points and Authorities in Supp. of Pl.'s Mot. for Entry of J.* (January 16, 2002) at

applies to entries after the mandate it would then have all the entries squarely before it, preventing any further gaming of the process by parties. The protest process would also allow for development of a factual record so the court can be specific in its application of § 1625(c). If the Plaintiff's protests are denied, then Plaintiff is free to file a suit with this court. Heartland may not be required to pay the liquidated duties on all the entries it seeks to adjudicate. Customs in the past has been willing to suspend liquidation pending the outcome of a case. *See Oral Arg. Tr.* at 39. Waiting to hear arguments with regard to the 60 day notice provision is advantageous in another way. Through the protest process the parties have a chance to reach an equitable solution to the problem without resorting to further judicial intervention. Without commenting further on the merits of each party's substantive claims relating to §1625(c) and the unfortunate timing of Customs' liquidations, the court has urged both sides to explore ways to bring this litigation to a conclusion, sooner rather than later.[16]

In this case, to maintain jurisdiction under § 1581(h), or extend it under § 1581(i), when another more comprehensive avenue is available is unwise. The court cannot overlook the fact that the Federal Circuit has determined the higher duty rate is the legally correct one. It is therefore difficult for the Plaintiff to make out a strong case that it is being severely prejudiced by its application sooner rather than later. The court originally found the extraordinary jurisdiction of § 1581(h) appropriate because the Revocation would have destroyed Heartland's long-term arrangements. Now the Federal Circuit has settled the long-term outlook of the company's

---

25. However, § 1581(i) is not appropriate when another avenue is available.

[16] *See Oral Arg. Tr.* at 40.

current business.  As for the remaining questionable liquidations by Customs, those are better handled by the traditional protest process and appeal to this court under § 1581(a).  This is especially true in light of Customs' recent decision to liquidate at the lower rate on some of the protested entries.  *See Oral Arg. Tr.* at 9.  It is conceivable that some cases originally brought under § 1581(h), even after a reversal, may necessitate the court's maintenance of jurisdiction after a mandate has issued.  That necessity is not present in this case.

### IV. CONCLUSION

For the foregoing reasons, the court declines to extend jurisdiction of this case and Plaintiff's Motion for Entry of Judgment is denied. Therefore, consistent with the mandate of the Court of Appeals for Federal Circuit in Appeal #00-1287, -1289, dated December 11, 2001, reversing the decision of this court dated October 19, 1999, there is nothing further for the court to determine in this matter and the case is dismissed.  Judgment will be entered accordingly.

Dated: _____                           _____
    New York, NY                                                 Judith M. Barzilay
                                         Judge